KAISER AETNA ET AL. *v.* UNITED STATES

No. 78–738.   Argued October 1, 1979—Decided December 4, 1979

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 180.

*Richard Charles Bocken* argued the cause for petitioners. With him on the briefs was *George Richard Morry.*

*Kathryn A. Oberly* argued the cause for the United States. With her on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, William Alsup, Raymond N. Zagone,* and *Martin Green.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The Hawaii Kai Marina was developed by the dredging and filling of Kuapa Pond, which was a shallow lagoon separated from Maunalua Bay and the Pacific Ocean by a barrier beach. Although under Hawaii law Kuapa Pond was private property, the Court of Appeals for the Ninth Circuit held that

---

**Charles D. Marshall, Jr.,* filed a brief for the Louisiana Landowners Association, Inc., as *amicus curiae* urging reversal.

when petitioners converted the pond into a marina and thereby connected it to the bay, it became subject to the "navigational servitude" of the Federal Government. Thus, the public acquired a right of access to what was once petitioners' private pond. We granted certiorari because of the importance of the issue and a conflict concerning the scope and nature of the servitude.[1]   440 U. S. 906 (1979).

## I

Kuapa Pond was apparently created in the late Pleistocene Period, near the end of the ice age, when the rising sea level caused the shoreline to retreat, and partial erosion of the headlands adjacent to the bay formed sediment that accreted to form a barrier beach at the mouth of the pond, creating a lagoon. It covered 523 acres on the island of Oahu, Hawaii, and extended approximately two miles inland from Maunalua Bay and the Pacific Ocean. The pond was contiguous to the bay, which is a navigable waterway of the United States, but was separated from it by the barrier beach.

Early Hawaiians used the lagoon as a fishpond and reinforced the natural sandbar with stone walls. Prior to the annexation of Hawaii, there were two openings from the pond to Maunalua Bay. The fishpond's managers placed removable sluice gates in the stone walls across these openings. Water from the bay and ocean entered the pond through the gates during high tide, and during low tide the current flow reversed toward the ocean. The Hawaiians used the tidal action to raise and catch fish such as mullet.

Kuapa Pond, and other Hawaiian fishponds, have always been considered to be private property by landowners and by the Hawaiian government. Such ponds were once an integral part of the Hawaiian feudal system. And in 1848 they were

---

[1] In the companion to this case, *Vaughn* v. *Vermilion Corp., post,* p. 206, the Louisiana Court of Appeal held that privately constructed canals, connected to navigable waters of the United States, navigable in fact, and used for commerce, are not subject to the federal navigational servitude. *356 So. 2d 551,* writ denied, *357 So. 2d 558 (1978).*

allotted as parts of large land units, known as "ahupuaas," by King Kamehameha III during the Great Mahele or royal land division. Titles to the fishponds were recognized to the same extent and in the same manner as rights in more orthodox fast land. Kuapa Pond was part of an ahupuaa that eventually vested in Bernice Pauahi Bishop and on her death formed a part of the trust corpus of petitioner Bishop Estate, the present owner.

In 1961, Bishop Estate leased a 6,000-acre area, which included Kuapa Pond, to petitioner Kaiser Aetna for subdivision development. The development is now known as "Hawaii Kai." Kaiser Aetna dredged and filled parts of Kuapa Pond, erected retaining walls, and built bridges within the development to create the Hawaii Kai Marina. Kaiser Aetna increased the average depth of the channel from two to six feet. It also created accommodations for pleasure boats and eliminated the sluice gates.

When petitioners notified the Army Corps of Engineers of their plans in 1961, the Corps advised them they were not required to obtain permits for the development of and operations in Kuapa Pond. Kaiser Aetna subsequently informed the Corps that it planned to dredge an 8-foot-deep channel connecting Kuapa Pond to Maunalua Bay and the Pacific Ocean, and to increase the clearance of a bridge of the Kalanianaole Highway—which had been constructed during the early 1900's along the barrier beach separating Kuapa Pond from the bay and ocean—to a maximum of 13.5 feet over the mean sea level. These improvements were made in order to allow boats from the marina to enter into and return from the bay, as well as to provide better waters. The Corps acquiesced in the proposals, its chief of construction commenting only that the "deepening of the channel may cause erosion of the beach."

At the time of trial, a marina-style community of approximately 22,000 persons surrounded Kuapa Pond. It included approximately 1,500 marina waterfront lot lessees. The water-

front lot lessees, along with at least 86 nonmarina lot lessees from Hawaii Kai and 56 boatowners who are not residents of Hawaii Kai, pay fees for maintenance of the pond and for patrol boats that remove floating debris, enforce boating regulations, and maintain the privacy and security of the pond. Kaiser Aetna controls access to and use of the marina. It has generally not permitted commercial use, except for a small vessel, the *Marina Queen,* which could carry 25 passengers and was used for about five years to promote sales of marina lots and for a brief period by marina shopping center merchants to attract people to their shopping facilities.

In 1972, a dispute arose between petitioners and the Corps concerning whether (1) petitioners were required to obtain authorization from the Corps, in accordance with § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U. S. C. § 403,[2] for future construction, excavation, or filling in the marina, and (2) petitioners were precluded from denying the public access to the pond because, as a result of the improvements, it had become a navigable water of the United States. The dispute foreseeably ripened into a lawsuit by the United States Government against petitioners in the United States

---

[2] Title 33 U. S. C. § 403 provides:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

District Court for the District of Hawaii. In examining the scope of Congress' regulatory authority under the Commerce Clause, the District Court held that the pond was "navigable water of the United States" and thus subject to regulation by the Corps under § 10 of the Rivers and Harbors Appropriation Act. 408 F. Supp. 42, 53 (1976). It further held, however, that the Government lacked the authority to open the now dredged pond to the public without payment of compensation to the owner. *Id.*, at 54. In reaching this holding, the District Court reasoned that although the pond was navigable for the purpose of delimiting Congress' regulatory power, it was not navigable for the purpose of defining the scope of the federal "navigational servitude" imposed by the Commerce Clause. *Ibid.* Thus, the District Court denied the Corps' request for an injunction to require petitioners to allow public access and to notify the public of the fact of the pond's accessibility.

The Court of Appeals agreed with the District Court's conclusion that the pond fell within the scope of Congress' regulatory authority, but reversed the District Court's holding that the navigational servitude did not require petitioners to grant the public access to the pond. 584 F. 2d 378 (1978). The Court of Appeals reasoned that the "federal regulatory authority over navigable waters . . . and the right of public use cannot consistently be separated. It is the public right of navigational use that renders regulatory control necessary in the public interest." *Id.*, at 383. The question before us is whether the Court of Appeals erred in holding that petitioners' improvements to Kuapa Pond caused its original character to be so altered that it became subject to an overriding federal navigational servitude, thus converting into a public aquatic park that which petitioners had invested millions of dollars in improving on the assumption that it was a privately owned pond leased to Kaiser Aetna.[3]

---

[3] Petitioners do not challenge the Court of Appeals' holding that the Hawaii Kai Marina is within the scope of Congress' regulatory power and

## II

The Government contends that petitioners may not exclude members of the public from the Hawaii Kai Marina because "[t]he public enjoys a federally protected right of navigation over the navigable waters of the United States." Brief for United States 13. It claims the issue in dispute is whether Kuapa Pond is presently a "navigable water of the United States." *Ibid.* When petitioners dredged and improved Kuapa Pond, the Government continues, the pond—although it may once have qualified as fast land—became navigable water of the United States.[4] The public thereby acquired a right to use Kuapa Pond as a continuous highway for navigation, and the Corps of Engineers may consequently obtain an injunction to prevent petitioners from attempting to reserve the waterway to themselves.

The position advanced by the Government, and adopted by the Court of Appeals below, presumes that the concept of "navigable waters of the United States" has a fixed meaning that remains unchanged in whatever context it is being applied. While we do not fully agree with the reasoning of the District Court, we do agree with its conclusion that all of this Court's cases dealing with the authority of Congress to regulate navigation and the so-called "navigational servitude" cannot simply be lumped into one basket. 408 F. Supp., at

---

subject to regulation by the Army Corps of Engineers pursuant to its authority under § 10 of the Rivers and Harbors Appropriation Act, 33 U. S. C. § 403.

[4] The Government further argues:

"The fact that the conversion was accomplished at private expense does not exempt Kuapa Pond from the navigable waters of the United States. To allow landowners to dredge their fast lands and reshape the navigable waters of the United States to more conveniently serve their land, and then to exclude the public from the navigable portions flowing over the site of former fast lands, would unduly burden navigation and commerce. The states lack the power under the Commerce Clause to sanction any such form of private property. . . ." Brief for United States 14–15.

48–49. As the District Court aptly stated, "any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." *Id.,* at 49.[5]

It is true that Kuapa Pond may fit within definitions of "navigability" articulated in past decisions of this Court. But it must be recognized that the concept of navigability in these decisions was used for purposes other than to delimit the boundaries of the navigational servitude: for example, to define the scope of Congress' regulatory authority under the Interstate Commerce Clause, see, *e. g., United States* v. *Appalachian Power Co.,* 311 U. S. 377 (1940); *South Carolina* v. *Georgia,* 93 U. S. 4 (1876); *The Montello,* 20 Wall. 430 (1874); *The Daniel Ball,* 10 Wall. 557 (1871), to determine the extent of the authority of the Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899,[6] and to

---

[5] Petitioners contend that the term "navigable waters of the United States," which has been traditionally employed to identify water subject to federal regulation and admiralty jurisdiction, see *infra,* this page and 172, "is so inherently unworkable with regard to Hawaiian fish ponds that it does not represent a meaningful or equitable standard under which public and private rights may be determined." Pet. for Cert. 8. The efforts to distinguish "fast lands" from public rights in waterways subject to the navigational servitude, however, has been the subject of litigation for more than a century, and in the absence of something more unusual than the situation presented here it is the Hawaiian fishpond that must fit into the decisions of this Court, rather than the latter being tailored to exclude the fishpond.

[6] See, *e. g., United States* v. *Republic Steel Corp.,* 362 U. S. 482 (1960) (deposit of industrial solids into river held to create an "obstruction" to the "navigable capacity" of the river forbidden by § 10 of the Rivers and Harbors Appropriation Act of 1899).

The Corps of Engineers has adopted the following general definition of "navigable waters":

"Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies

establish the limits of the jurisdiction of federal courts conferred by Art. III, § 2, of the United States Constitution over admiralty and maritime cases.[7] Although the Government is clearly correct in maintaining that the now dredged Kuapa Pond falls within the definition of "navigable waters" as this Court has used that term in delimiting the boundaries of Congress' regulatory authority under the Commerce Clause, see, *e. g., The Daniel Ball, supra,* at 563; *The Montello, supra,* at 441–442; *United States* v. *Appalachian Power Co., supra,* at 407–408, this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation. Thus, while Kuapa Pond may be subject to regulation by the Corps of Engineers, acting under the authority delegated it by Congress in the Rivers

laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity." 33 CFR § 329.4 (1978).

[7] "Navigable water" subject to federal admiralty jurisdiction was defined as including waters that are navigable in fact in *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443 (1852). See also, *e. g., The Belfast,* 7 Wall. 624 (1869). And in *Ex parte Boyer,* 109 U. S. 629 (1884), this Court held that such jurisdiction extended to artificial bodies of water:

"Navigable water situated as this canal is, used for the purposes for which it is used, a highway for commerce between ports and places in different States, carried on by vessels such as those in question here, is public water of the United States, and within the legitimate scope of the admiralty jurisdiction conferred by the Constitution and statutes of the United States, even though the canal is wholly artificial, and is wholly within the body of a State, and subject to its ownership and control; and it makes no difference as to the jurisdiction of the district court that one or the other of the vessels was at the time of the collision on a voyage from one place in the State of Illinois to another place in that State." *Id.,* at 632.

Congress, pursuant to its authority under the Necessary and Proper Clause of Art. I to enact laws carrying into execution the powers vested in other departments of the Federal Government, has also been recognized as having the power to legislate with regard to matters concerning admiralty and maritime cases. *Butler* v. *Boston S. S. Co.,* 130 U. S. 527, 557 (1889). See also, *e. g., In re Garnett,* 141 U. S. 1, 12 (1891).

and Harbors Appropriation Act, it does not follow that the pond is also subject to a public right of access.

## A

Reference to the navigability of a waterway adds little if anything to the breadth of Congress' regulatory power over interstate commerce. It has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause. Early in our history this Court held that the power to regulate commerce necessarily includes power over navigation. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189 (1824). As stated in *Gilman* v. *Philadelphia,* 3 Wall. 713, 724–725 (1866):

> "Commerce includes navigation. The power to regu-late commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress."

The pervasive nature of Congress' regulatory authority over national waters was more fully described in *United States* v. *Appalachian Power Co., supra,* at 426–427:

> "[I]t cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. . . . In truth the authority of the United States is the regulation of commerce on its waters. Navigability . . . is but a part of this whole. Flood protec-tion, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control. . . . [The] authority is as broad as the needs of commerce. . . . The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government."

*Appalachian Power Co.* indicates that congressional authority over the waters of this Nation does not depend on a stream's "navigability." And, as demonstrated by this Court's decisions in *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937), *United States* v. *Darby,* 312 U. S. 100 (1941), and *Wickard* v. *Filburn,* 317 U. S. 111 (1942), a wide spectrum of economic activities "affect" interstate commerce and thus are susceptible of congressional regulation under the Commerce Clause irrespective of whether navigation, or, indeed, water, is involved. The cases that discuss Congress' paramount authority to regulate waters used in interstate commerce are consequently best understood when viewed in terms of more traditional Commerce Clause analysis than by reference to whether the stream in fact is capable of supporting navigation or may be characterized as "navigable water of the United States." With respect to the Hawaii Kai Marina, for example, there is no doubt that Congress may prescribe the rules of the road, define the conditions under which running lights shall be displayed, require the removal of obstructions to navigation, and exercise its authority for such other reason as may seem to it in the interest of furthering navigation or commerce.

## B

' In light of its expansive authority under the Commerce Clause, there is no question but that Congress could assure the public a free right of access to the Hawaii Kai Marina if it so chose. Whether a statute or regulation that went so far amounted to a "taking," however, is an entirely separate question.[8] *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922). As was recently pointed out in *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104 (1978),

---

[8] Thus, this Court has observed that "[c]onfiscation may result from a taking of the use of property without compensation quite as well as from the taking of the title." *Chicago, R. I. & P. R. Co.* v. *United States,* 284 U. S. 80, 96 (1931).

this Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.*, at 124. Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action—that have particular significance. *Ibid.* When the "taking" question has involved the exercise of the public right of navigation over interstate waters that constitute highways for commerce, however, this Court has held in many cases that compensation may not be required as a result of the federal navigational servitude. See, *e. g.*, *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53 (1913).

## C

The navigational servitude is an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation. See *United States* v. *Cress*, 243 U. S. 316 (1917). Thus, in *United States* v. *Chandler-Dunbar Co., supra*, at 69, this Court stated that "the running water in a great navigable stream is [incapable] of private ownership. . . ." And, in holding that a riparian landowner was not entitled to compensation when the construction of a pier cut off his access to navigable water, this Court observed:

> "The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of

a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation." *Scranton* v. *Wheeler,* 179 U. S. 141, 163 (1900).

For over a century, a long line of cases decided by this Court involving Government condemnation of "fast lands" delineated the elements of compensable damages that the Government was required to pay because the lands were riparian to navigable streams. The Court was often deeply divided, and the results frequently turned on what could fairly be described as quite narrow distinctions. But this is not a case in which the Government recognizes any obligation whatever to condemn "fast lands" and pay just compensation under the Eminent Domain Clause of the Fifth Amendment to the United States Constitution. It is instead a case in which the owner of what was once a private pond, separated from concededly navigable water by a barrier beach and used for aquatic agriculture, has invested substantial amounts of money in making improvements. The Government contends that as a result of one of these improvements, the pond's connection to the navigable water in a manner approved by the Corps of Engineers, the owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others.

Because the factual situation in this case is so different from typical ones involved in riparian condemnation cases, we see little point in tracing the historical development of that doctrine here. Indeed, since this Court's decision in *United States* v. *Rands,* 389 U. S. 121, 123 (1967), closely following its decisions in *United States* v. *Virginia Electric &*

*Power Co.,* 365 U. S. 624, 628 (1961), and *United States* v. *Twin City Power Co.,* 350 U. S. 222, 226 (1956), the elements of compensation for which the Government must pay when it condemns fast lands riparian to a navigable stream have remained largely settled. Distinctions between cases such as these, on the one hand, and *United States* v. *Kansas City Life Ins. Co.,* 339 U. S. 799, 808 (1950), may seem fine, indeed, in the light of hindsight, but perhaps for the very reason that it *is* hindsight which we now exercise, the shifting back and forth of the Court in this area until the most recent decisions bears the sound of "Old, unhappy, far-off things, and battles long ago."

There is no denying that the strict logic of the more recent cases limiting the Government's liability to pay damages for riparian access, if carried to its ultimate conclusion, might completely swallow up any private claim for "just compensation" under the Fifth Amendment even in a situation as different from the riparian condemnation cases as this one. But, as Mr. Justice Holmes observed in a very different context, the life of the law has not been logic, it has been experience. The navigational servitude, which exists by virtue of the Commerce Clause in navigable streams, gives rise to an authority in the Government to assure that such streams retain their capacity to serve as continuous highways for the purpose of navigation in interstate commerce. Thus, when the Government acquires fast lands to improve navigation, it is not required under the Eminent Domain Clause to compensate landowners for certain elements of damage attributable to riparian location, such as the land's value as a hydroelectric site, *Twin City Power Co., supra,* or a port site, *United States* v. *Rands, supra.* But none of these cases ever doubted that when the Government wished to acquire fast lands, it was required by the Eminent Domain Clause of the Fifth Amendment to condemn and pay fair value for that interest. See *United States* v. *Kansas City Life Ins. Co., supra,* at 800; *United States* v. *Virginia Electric & Power Co.,*

*supra,* at 628; *United States* v. *Rands, supra,* at 123. The nature of the navigational servitude when invoked by the Government in condemnation cases is summarized as well as anywhere in *United States* v. *Willow River Co.,* 324 U. S. 499, 502 (1945):

> "It is clear, of course, that a head of water has value and that the Company has an economic interest in keeping the St. Croix at the lower level. But not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion."

We think, however, that when the Government makes the naked assertion it does here, that assertion collides with not merely an "economic advantage" but an "economic advantage" that has the law back of it to such an extent that courts may "compel others to forbear from interfering with [it] or to compensate for [its] invasion." *United States* v. *Willow River Co., supra,* at 502.

Here, the Government's attempt to create a public right of access to the improved pond goes so far beyond ordinary regulation or improvement for navigation as to amount to a taking under the logic of *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922). More than one factor contributes to this result.[9] It is clear that prior to its improvement, Kuapa Pond was incapable of being used as a continuous highway for the purpose of navigation in interstate commerce. Its maximum depth at high tide was a mere two feet, it was separated from the adjacent bay and ocean by a natural barrier beach, and its principal commercial value was limited to fishing.[10] It

---

[9] We do not decide, however, whether in some circumstances one of these factors by itself may be dispositive.

[10] While it was still a fishpond, a few flat-bottomed shallow draft boats were operated by the fishermen in their work. There is no evidence, how-

consequently is not the sort of "great navigable stream" that this Court has previously recognized as being "[incapable] of private ownership." See, *e. g., United States* v. *Chandler-Dunbar Co.,* 229 U. S., at 69; *United States* v. *Twin City Power Co., supra,* at 228. And, as previously noted, Kuapa Pond has always been considered to be private property under Hawaiian law. Thus, the interest of petitioners in the now dredged marina is strikingly similar to that of owners of fast land adjacent to navigable water.

We have not the slightest doubt that the Government could have refused to allow such dredging on the ground that it would have impaired navigation in the bay, or could have conditioned its approval of the dredging on petitioners' agreement to comply with various measures that it deemed appropriate for the promotion of navigation. But what petitioners now have is a body of water that was private property under Hawaiian law, linked to navigable water by a channel dredged by them with the consent of the Government. While the consent of individual officials representing the United States cannot "estop" the United States, see *Montana* v. *Kennedy,* 366 U. S. 308, 314–315 (1961); *INS* v. *Hibi,* 414 U. S. 5 (1973), it can lead to the fruition of a number of expectancies embodied in the concept of "property"—expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over the management of the landowner's property. In this case, we hold that the "right to exclude," so universally held to be a fundamental element of

ever, that even these boats could acquire access to the adjacent bay and ocean from the pond.

Although Kuapa Pond clearly was not navigable in fact in its natural state, the dissent argue that the pond nevertheless was "navigable water of the United States" prior to its development because it was subject to the ebb and flow of the tide. *Post,* at 181, 183, 186. This Court has never held, however, that whenever a body of water satisfies this mechanical test, the Government may invoke the "navigational servitude" to avoid payment of just compensation irrespective of the private interests at stake.

the property right,[11] falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. Compare *Andrus* v. *Allard, ante,* at 65–66, with the traditional taking of fee interests in *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266 (1943), and in *United States* v. *Miller,* 317 U. S. 369 (1943). And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation. See *United States* v. *Causby,* 328 U. S. 256, 265 (1946); *Portsmouth Co.* v. *United States,* 260 U. S. 327 (1922). Thus, if the Government wishes to make what was formerly Kuapa Pond into a public aquatic park after petitioners have proceeded as far as they have here, it may not, without invoking its eminent domain power and paying just compensation, require them to allow free access to the dredged pond while petitioners' agreement with their customers calls for an annual $72 regular fee.

Accordingly the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court holds today that, absent compensation, the public may be denied a right of access to "navigable waters of the

---

[11] See, *e. g., United States* v. *Pueblo of San Ildefonso,* 206 Ct. Cl. 649, 669–670, 513 F. 2d 1383, 1394 (1975); *United States* v. *Lutz,* 295 F. 2d 736, 740 (CA5 1961). As stated by Mr. Justice Brandeis, "[a]n essential element of individual property is the legal right to exclude others from enjoying it." *International News Service* v. *Associated Press,* 248 U. S. 215, 250 (1918) (dissenting opinion).

United States" that have been created or enhanced by private means. I find that conclusion neither supported in precedent nor wise in judicial policy, and I dissent.

My disagreement with the Court lies in four areas. First, I believe the Court errs by implicitly rejecting the old and long-established "ebb and flow" test of navigability as a source for the navigational servitude the Government claims. Second, I cannot accept the notion, which I believe to be without foundation in precedent, that the federal "navigational servitude" does not extend to all "navigable waters of the United States." Third, I reach a different balance of interests on the question whether the exercise of the servitude in favor of public access requires compensation to private interests where private efforts are responsible for creating "navigability in fact." And finally, I differ on the bearing that state property law has on the questions before us today.

I

The first issue, in my view, is whether Kuapa Pond is "navigable water of the United States," and, if so, why. The Court begins by asking "whether . . . petitioners' improvements to Kuapa Pond caused its original character to be so altered that it became subject to an overriding federal navigational servitude." *Ante,* at 169. It thus assumes that the only basis for extension of federal authority must have arisen *after* the pond was "developed" and transformed into a marina. This choice of starting point overlooks the Government's contention, advanced throughout this litigation, that Kuapa Pond was navigable water in its natural state, long prior to petitioners' improvements, by virtue of its susceptibility to the ebb and flow of the tide.[1]

---

[1] The District Court found that "the Pacific tides ebbed and flowed over Kuapa Pond in its pre-marina state." 408 F. Supp. 42, 50 (Haw. 1976). The tide entered through two openings in the barrier beach; it also percolated through the barrier beach itself. *Id.,* at 46. Although

The Court concedes that precedent does not disclose a single criterion for identifying "navigable waters." I read our prior cases to establish three distinct tests: "navigability in fact," "navigable capacity," and "ebb and flow" of the tide. Navigability in fact has been used as a test for the scope of the dominant federal interest in navigation since *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 457 (1852), and *The Daniel Ball*, 10 Wall. 557, 563 (1871). The test of navigable capacity is of more recent origin; it hails from *United States* v. *Appalachian Power Co.*, 311 U. S. 377, 407–408 (1940), where it was used to support assertion of the federal navigational interest over a river nonnavigable in its natural state but capable of being rendered fit for navigation by "reasonable improvements." Ebb and flow is the oldest test of the three. It was inherited from England, where under common law it was used to define ownership of navigable waters by the Crown. In the early days of the Republic, it was regarded as the exclusive test of federal jurisdiction over the waterways of this country. See *The Thomas Jefferson*, 10 Wheat. 428, 429 (1825); *Waring* v. *Clarke*, 5 How. 441, 463–464 (1847).

Petitioners say that the ebb-and-flow test was abandoned in *The Propeller Genesee Chief* and *The Daniel Ball* in favor of navigability in fact. I do not agree with that interpretation. It is based upon language in those opinions suggesting that the test is "arbitrary," that it bears no relation to what is "suitable" for federal control, that it "has no application in this country," and indeed that it is not "any test at all." See *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How., at 454; *The Daniel Ball*, 10 Wall., at 563. One may acknowledge the language without accepting petitioners' inference. *The Propeller Genesee Chief* and *The Daniel Ball* were concerned with *extending* federal power to accommodate the stark realities of

---

"[l]arge areas of land at the inland end were completely exposed at low tide," the entire pond was inundated at high tide. *Ibid.*

fresh-water commerce. In the former the question was whether admiralty jurisdiction included the Great Lakes. In the latter the question was the scope of federal regulatory power over navigation on a river. In either case it is not surprising that the Court, contemplating the substantial interstate fresh-water commerce on our lakes and rivers, found a test developed in England, an island nation with no analogue to our rivers and lakes, unacceptable as a test for the extent of federal power over these inland waterways. Cf. *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How., at 454-457. But the inadequacy of the test for defining the interior reach of federal power over navigation does not mean that the test must be, or must have been, abandoned for determining the breadth of federal power on our coasts.

The ebb-and-flow test is neither arbitrary nor unsuitable when applied in a coastwise setting. The ebb and flow of the tide define the geographical, chemical, and environmental limits of the three oceans and the Gulf that wash our shores. Since those bodies of water in the main are navigable, they should be treated as navigable to the inner reach of their natural limits. Those natural limits encompass a water body such as Kuapa Pond, which is contiguous to Maunalua Bay, and which in its natural state must be regarded as an arm of the sea, subject to its tides and currents as much as the Bay itself.

I take it the Court must concede that, at least for regulatory purposes, the pond in its current condition is "navigable water" because it is now "navigable in fact." See *ante,* at 172. I would add that the pond was "navigable water" prior to development of the present marina because it was subject to the ebb and flow of the tide. In view of the importance the Court attaches to the fact of private development,[2]

---

[2] The Court's opinion also embraces, distressingly for me, an implication that the *amount* of the private investment somehow influences the legal result. *Ante,* at 167, 169, and 180. I would think that the consequences

this alternative basis for navigability carries significant implications.[3]

## II

A more serious parting of ways attends the question whether the navigational servitude extends to all "navigable waters of the United States," however the latter may be established.[4] The Court holds that it does not, at least where navigability is in whole or in part the work of private hands. I disagree.

The Court notes that the tests of navigability I have set forth originated in cases involving questions of federal regulation rather than application of the navigational servitude. *Ante,* at 171–173. It also notes that Congress has authority to regulate in aid of navigation far beyond the limitations of "navigability." *Ante,* at 173–174. From these indisputable propositions the Court concludes that "navigable waters" for these other purposes need not be the same as the "navigable waters" to which the navigational servitude applies.

Preliminarily, it must be recognized that the issue is *not* whether the navigational servitude runs to every watercourse over which the Federal Government may exercise its regula-

would be the same whether the developer invested $100 or, as the Court stresses, *ante,* at 169, "millions of dollars."

[3] Essentially for the reasons stated by the District Court, 408 F. Supp., at 49–50, I stop short of agreeing with the Government's contention that the pond has been shown to be navigable under the *Appalachian Power* test. Although petitioners found it "reasonable" to deepen the pond for private development of the surrounding land, it does not follow that the same improvements would be equally "reasonable" if viewed solely in terms of benefits to navigational commerce.

[4] In addressing this question, we quickly may cast aside any distinction based on the qualifying phrase "of the United States." As prior cases demonstrate, this phrase is intended to draw the line between waters that may be navigated only intrastate, and those that are subject to navigation in interstate and foreign commerce. See, *e. g., United States* v. *Utah,* 283 U. S. 64, 75 (1931); *The Daniel Ball,* 10 Wall. 557, 563 (1871). Since Kuapa Pond opens onto a bay of the Pacific Ocean, there can be no doubt that it may be navigated in interstate and foreign commerce.

tory power to promote navigation. Regulatory jurisdiction "in aid of" navigation extends beyond the navigational servitude, and indeed beyond navigable water itself. In *United States* v. *Rio Grande Dam & Irrig. Co.,* 174 U. S. 690, 707–710 (1899), for example, the Court confirmed the Federal Government's power to enjoin an irrigation project above the limits of navigable water on the Rio Grande River because that project threatened to destroy navigability below. But this is not such a case. Federal authority over Kuapa Pond does not stem solely from an effect on navigable water elsewhere, although this might be a sound alternative basis for regulatory jurisdiction. Instead, the authority arises because the pond itself is navigable water.

Nor does it advance analysis to suggest that we might decide to call certain waters "navigable" for some purposes, but "nonnavigable" for purposes of the navigational servitude. See *ante,* at 170–171. To my knowledge, no case has ever so held. Although tests of navigability have originated in other contexts, prior cases have never attempted to limit any test of navigability to a single species of federal power. Indeed, often they have referred to "navigable" water as "public" water. See, *e. g., The Propeller Genesee Chief* v. *Fitzhugh,* 12 How., at 455, 457; *The Daniel Ball,* 10 Wall., at 563. In any event, to say that Kuapa Pond is somehow "nonnavigable" for present purposes, and that it is not subject to the navigational servitude for this reason, is merely to substitute one conclusion for another. To sustain its holding today, I believe that the Court must prove the more difficult contention that the navigational servitude does not extend to waters that are clearly navigable and fully subject to use as a highway for interstate commerce.

The Court holds, in essence, that the extent of the servitude does not depend on whether a waterway is navigable under any of the tests, but on whether the navigable waterway is "natural" or privately developed. In view of the fact that

Kuapa Pond originally was created by natural forces, and that its separation from the Bay has been maintained by the interaction of natural forces and human effort, neither characterization seems particularly apt in this case.[5]  One could accept the Court's approach, however, and still find that the servitude extends to Kuapa Pond, by virtue of its status prior to development under the ebb-and-flow test.  Nevertheless, I think the Court's reasoning on this point is flawed.  In my view, the power we describe by the term "navigational servitude" extends to the limits of interstate commerce by water; accordingly, I would hold that it is coextensive with the "navigable waters of the United States."

As the Court recognizes, *ante,* at 174–175, the navigational servitude symbolizes the dominant federal interest in navigation implanted in the Commerce Clause.  See *Scranton* v. *Wheeler,* 179 U. S. 141, 159–163 (1900); cf. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189–190 (1824).  To preserve this interest, the National Government has been given the power not only to regulate interstate commerce by water, but also to control the waters themselves, and to maintain them as "common highways, . . . forever free."  See the Act of Aug. 7, 1789, 1 Stat. 50, 52, n. (a) (navigable waters in Northwest Territory).  See *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 62–64 (1913); *Gilman* v. *Philadelphia,* 3 Wall. 713, 724–725 (1866).  The National Government is guardian of a public right of access to navigable waters of the United States.  The navigational servitude is the legal formula by which we recognize the paramount nature of this governmental responsibility.

The Court often has observed the breadth of federal power in this context.  In *United States* v. *Twin City Power Co.,* 350 U. S. 222 (1956), for example, it stated:

"The interest of the United States in the flow of a navigable stream originates in the Commerce Clause.

---

[5] The natural and human contributions to the character of the pond are described by the District Court. See 408 F. Supp., at 46.

That Clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called 'a dominant servitude' or 'a superior navigation easement.' " (Citations omitted.) *Id.*, at 224–225.

Perhaps with somewhat different emphasis, the Court also has stated, in cases involving navigable waters, that "the flow of the stream [is] in no sense private property," *United States* v. *Chandler-Dunbar Co.*, 229 U. S., at 66, and that the waters themselves "are the public property of the nation." *Gilman* v. *Philadelphia*, 3 Wall., at 725.

The Court in *Twin City Power Co.* recognized that what is at issue is a matter of power, not of property. The servitude, in order to safeguard the Federal Government's paramount control over waters used in interstate commerce, limits the power of the States to create conflicting interests based on local law. That control does not depend on the form of the water body or the manner in which it was created, but on the fact of navigability and the corresponding commercial significance the waterway attains. Wherever that commerce can occur, be it Kuapa Pond or Honolulu Harbor, the navigational servitude must extend.

### III

The conclusion that the navigational servitude extends to privately created or enhanced waters does not entirely dispose of this case. There remains the question whether the Government's resort to the servitude requires compensation for private investment instrumental in effecting or improving navigability. The Court, of course, concludes that there is no navigational servitude and, accordingly, that assertion of public access constitutes a compensable taking. Because I do not agree with the premise, I cannot conclude that the right to

compensation for opening the pond to the public is a necessary result. Nevertheless, I think this question requires a balancing of private and public interests.

Ordinarily, "[w]hen the Government exercises [the navigational] servitude, it is exercising its paramount power in the interest of navigation, rather than taking the private property of anyone." *United States* v. *Kansas City Ins. Co.*, 339 U. S. 799, 808 (1950). See also *United States* v. *Willow River Co.*, 324 U. S. 499, 509–510 (1945); *Lewis Blue Point Oyster Co.* v. *Briggs*, 229 U. S. 82, 87–88 (1913); *Gibson* v. *United States*, 166 U. S. 269, 276 (1897). The Court's prior cases usually have involved riparian owners along navigable rivers who claim losses resulting from the raising or lowering of water levels in the navigable stream, or from the construction of artificial aids to navigation, such as dams or locks. In these cases the Court has held that no compensation is required for loss in water power due to impairment of the navigable water's flow, *e. g., United States* v. *Twin City Power Co.*, 350 U. S., at 226–227; *United States* v. *Chandler-Dunbar Co.*, 229 U. S., at 65–66; for loss in "head" resulting from raising the stream, *United States* v. *Willow River Co.*, 324 U. S., at 507–511; for damage to structures erected between low- and high-water marks, *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592, 595–597 (1941); for loss of access to navigable water caused by necessary improvements, *United States* v. *Commodore Park, Inc.*, 324 U. S. 386, 390–391 (1945); *Scranton* v. *Wheeler*, 179 U. S., at 163; or for loss of value to adjoining land based on potential use in navigational commerce, *United States* v. *Rands*, 389 U. S. 121, 124–125 (1967). The Court also has held that no compensation is required when "obstructions," such as bridges or wharves, are removed or altered to improve navigation, despite their obvious commercial value to those who erected them, and despite the Federal Government's original willingness to have them built. See, *e. g., Greenleaf Lumber Co.* v. *Garrison*, 237 U. S. 251, 256, 258–264

(1915); *Union Bridge Co.* v. *United States,* 204 U. S. 364, 400 (1907).[6]

These cases establish a key principle that points the way for decision in the present context. In most of them, the non-compensable loss was related, either directly or indirectly, to the riparian owner's "access to, and use of, navigable waters." *United States* v. *Rands,* 389 U. S., at 124–125. However that access or use may have been turned to account for personal gain, and no matter how much the riparian owner had invested to enhance the value, the Court held that these rights were

---

[6] There have been cases where compensation was required for private investment in improvement of navigation. Petitioners place particular reliance on *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312 (1893). In that case, a private company had constructed locks and dams along the Monongahela River in order to improve its navigability. The company acted under express authority from the State of Pennsylvania, and at the invitation of the United States. Subsequently, Congress authorized the purchase or condemnation of one lock and dam in connection with a project to improve the upper waters of the river. Congress did not authorize compensation for the right to collect tolls. The Court emphasized the Government's role in encouraging the project, and held that, in consequence, "it does not lie in the power of . . . the United States to say that such lock and dam are an obstruction and wrongfully there, or that the right to compensation for the use of this improvement by the public does not belong to its owner, the Navigation Company." *Id.,* at 335. Subsequent decisions have limited *Monongahela Navigation Co.* to this rationale. See *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82, 89 (1913); *Greenleaf Lumber Co.* v. *Garrison,* 237 U. S., at 265; cf. *United States* v. *Rands,* 389 U. S. 121, 126 (1967).

There is a striking difference between *Monongahela Navigation Co.* and this case. Although the Army Corps of Engineers originally may have acquiesced in the improvement of Kuapa Pond, it did not invite or actively encourage the development for the benefit of public navigation. The difference is significant. In *Monongahela Navigation Co.* the United States was required to compensate for the commercial value of navigational improvements it had promoted. In this case, in order to maintain uniformly free navigation, the Government now must compensate for improvements it might not have undertaken if it were at liberty independently to assess the advisability of opening the pond to navigation.

shared with the public at large. Actions taken to improve their value for the many caused no reimbursable damage to the few who, by the accident of owning contiguous "fast land," previously enjoyed the blessings of the common right in greater measure. See, *e. g., United States* v. *Commodore Park, Inc.,* 324 U. S., at 390–391. The Court recognized that encroachment on rights inhering separately in the adjoining "fast land," *United States* v. *Virginia Electric Co.,* 365 U. S. 624, 628 (1961), or resulting from access to *nonnavigable* tributaries, see *United States* v. *Cress,* 243 U. S. 316 (1917), might form the basis for a valid compensation claim. But the principal distinction was that these compensable values had nothing to do with use of the navigable water.

Application of this principle to the present case should lead to the conclusion that the developers of Kuapa Pond have acted at their own risk and are not entitled to compensation for the public access the Government now asserts. See *Union Bridge Co.* v. *United States,* 204 U. S., at 400. The chief value of the pond in its present state obviously is a value of access to navigable water. Development was undertaken to improve and enhance this value, not to improve the value of the pond as some aquatic species of "fast land." [7] Petitioners do not question the Federal Government's plenary control over the waters of the Bay, and they have no vested right in access to its open water. Since the value of the pond and the motive for improving it lie in access to a highway of commerce, I am drawn to the conclusion that the petitioners' interest in the improved waters of the pond is not subject to compensation. Whatever expectancy petitioners may have had in control over the pond for use as a fishery was surrendered in exchange for

---

[7] I need not reach the question whether petitioners could have been compensated for the value of the pond as a fishery if the Government had decided, prior to development of Hawaii Kai, either to cut off access to the Bay or to dredge the pond. But cf. *United States* v. *Commodore Park, Inc.,* 324 U. S. 386, 390 (1945); *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82 (1913).

the advantages of access when they cut a channel into the Bay.

In contrast, the Government's interest in vindicating a public right of access to the pond is substantial. It is the very interest in maintaining "common highways, . . . forever free." After today's decision, it is open to any developer to claim that private improvements to a waterway navigable in interstate commerce have transformed "navigable water of the United States" into private property, at least to the extent that he may charge for access to the portion improved. Such appropriation of navigable waters for private use directly injures the freedom of commerce that the navigational servitude is intended to safeguard. In future cases, of course, the Army Corps of Engineers may alleviate this danger by conditioning permission for connection with other waterways on a right of free public access. But it seems to me that the inevitable result of today's decision is the introduction of new legal uncertainty in a field where I had thought the "battles long ago," *ante,* at 177, had achieved some settled doctrine.

## IV

I come, finally, to the question whether Kuapa Pond's status under state law ought to alter this conclusion drawn from federal law. The Court assumes, without much discussion, that Kuapa Pond is the equivalent of "fast land" for purposes of Hawaii property law. There is, to be sure, support for this assumption, and for present purposes I am prepared to follow the Court in making it. See, *e. g., In re Application of Kamakana,* 58 Haw. 632, 574 P. 2d 1346 (1978). Nonetheless, I think it clear that local law concerns rights of title and use between citizen and citizen, or between citizen and state, but does not affect the scope or effect of the federal navigational servitude.

The rights in Kuapa fisheries that have been part of Hawaii law since the Great Mahele are not unlike the right to the use of the floor of a bay that was at issue in *Lewis Blue Point*

*Oyster Co.* v. *Briggs,* 229 U. S. 82 (1913). There the Court found no entitlement to compensation for destruction of an oysterbed in the course of dredging a channel. The Court reasoned: "If the public right of navigation is the dominant right and if, as must be the case, the title of the owner of the bed of navigable waters holds subject absolutely to the public right of navigation, this dominant right must include the right to use the bed of the water for every purpose which is in aid of navigation." *Id.,* at 87. By similar logic, I do not think Hawaii or any other State is at liberty through local law to defeat the navigational servitude by transforming navigable water into "fast land." Instead, state-created interests in the waters or beds of such navigable water are secondary to the navigational servitude. Thus, I believe this case should be decided purely as a matter of federal law, in which state law cannot control the scope of federal prerogatives.

For all of the foregoing reasons, the judgment of the Court of Appeals was correct. I therefore dissent.