Frances L. SWANSON, individually and as a member of Bonner County Shoreline Property Owners and Taxpayers Protective Association, Inc., an Idaho non-profit corporation, and Bonner County Shoreline Property Owners and Taxpayers Protective Association, Inc., an Idaho non-profit corporation, Plaintiffs,

v.

The UNITED STATES of America; Clifford L. Alexander, Jr.; Lieutenant General John W. Morris, Jr.; Brigadier General Richard M. Wells; and Colonel Leon K. Moraski, Defendants.

Civ. No. 80–2069.

United States District Court,
D. Idaho.

Jan. 16, 1985.

Steven L. Herndon, McAdam, Herndon & Harrison, Sandpoint, Idaho, for plaintiffs.

Michael W. Neville, Atty., Environmental Defense Section, Land & Natural Resources Division, U.S. Dept. of Justice, Washington, D.C., Siri Nelson, General Atty., U.S. Army Corps of Engineers, Seattle District, Seattle, Wash., Jeffrey G. Howe, Asst. U.S. Atty., Boise, Idaho, for defendants.

## MEMORANDUM OPINION

RYAN, District Judge.

This action arises from a dispute concerning the United States Army Corps of

Engineers' (Corps) power to regulate the use of the underlying lands and waters of Lake Pend Oreille. Plaintiff Swanson is a property owner of land located adjacent to the lake. Plaintiff Bonner County Shoreline Property Owners and Taxpayers Protective Association, Inc., is an Idaho non-profit corporation, organized for the express purpose of uniting owners of land located adjacent to Lake Pend Oreille. Named as defendants are the United States; the current Secretary of the Army; the Chief of the United States Army Corps of Engineers; the Division Engineer for the North Pacific Division of the United States Army Corps of Engineers; and the District Engineer for the Seattle District of the United States Army Corps of Engineers.

Following the completion of discovery, counsel for the respective parties agreed to submit the issues presented to the court upon stipulated facts. A lengthy stipulation of facts, together with supporting exhibits, was submitted to the court and a briefing schedule was established. After the required briefing had been completed, the court scheduled and entertained the oral argument of counsel.

## FACTS

According to the stipulated facts, during the early 1950's the Corps constructed the Albeni Falls Dam on the west end of Lake Pend Oreille pursuant to the Rivers and Harbors Act of 1899. As a direct result of the project, the ordinary high water mark of Lake Pend Oreille was raised from 2,051 to 2,062.5 feet above mean sea level (MSL). As the level of the lake rose, adjacent fast lands were flooded. In August of 1952, the United States filed before this court a Declaration of Taking, seeking flowage easements in lands now owned by Swanson lying between the old ordinary high water mark and the new ordinary high water mark. On December 21, 1956, a Judgment was entered by the court condemning the flowage easements sought by the United States.

For purposes of this proceeding only, the parties agree that prior to the construction of the Albeni Falls Dam, Lake Pend Oreille in its entirety was a navigable water of the United States with an ordinary high water mark at 2,051 feet above MSL. It was also stipulated that prior to the construction, Lake Pend Oreille (1) was navigable in fact; (2) was a navigable water of the United States; (3) was a water of the United States; and (4) had an ordinary high water mark at 2051 feet above MSL. After the dam was completed, the parties dispute whether the waters of Lake Pend Oreille lying above lands situated between 2,051 and 2,062.5 feet above MSL are waters of the United States and/or navigable waters of the United States.

In 1971, a Regulatory Function Section was initiated in the Seattle District Office of the Corps of Engineers. On February 18, 1971, representatives from the Corps met with concerned property owners. A Public Information Brochure was distributed by the Corps at that time. The brochure notified concerned individuals that the Rivers and Harbors Act required the acquisition of permits prior to the instigation of any work in the navigable waters of Lake Pend Oreille. It was the Corps' position that all waters at or below the new ordinary high water mark established at 2,062.5 feet above MSL were navigable waters of the United States. The parties dispute whether public notice of the permit requirement was given prior to the 1971 brochure.

In 1971, Swanson caused a concrete retaining wall, a pier, a boat lift, and a concrete boat launching ramp to be constructed on lands situated under Lake Pend Oreille below the 2,062.5 feet above MSL ordinary high water mark. Swanson had not applied for a Section 10 permit from the Corps as allegedly required by the Rivers and Harbor Act, 33 U.S.C. § 403. On November 23, 1979, Swanson received a "stop work" letter from the Corps notifying her that her property had been inspected by the Corps. The letter indicated that the Corps considered the improvements to be in violation of federal law. The Corps cited

Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The letter directed Swanson to desist from any further work in violation of the federal statutes and to submit certain drawings and other requested information.

Following Swanson's receipt of the "stop work" letter, plaintiffs filed suit before this court requesting declaratory and injunctive relief. Plaintiffs cited federal jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201. Specifically, plaintiffs request a decree declaring that the waters of Lake Pend Oreille, being stored on lands above elevation 2,051 feet MSL, are not navigable waters of the United States subject to Section 10 or Section 404 regulation. In addition, plaintiffs request that defendants be enjoined from maintaining that these waters are navigable waters of the United States and from enforcing or attempting to enforce any public right of access.

### ISSUES

After carefully studying the pleadings and briefs in this matter, the court believes that three distinct issues emerge. First, the court must determine whether plaintiffs have properly exhausted the available administrative remedies. Second, the court must determine which claims brought by the plaintiffs are ripe for judicial review. Third, the court must pass on the merits of the claims properly presented.

### EXHAUSTION

In *State of California ex rel Christensen v. F.T.C.*, 549 F.2d 1321 (9th Cir.), *cert. denied*, 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 156 (1977), the court of appeals for this circuit noted the following rule which requires a litigant to exhaust his administrative remedies:

A familiar rule of administrative law provides that judicial relief for a supposed or threatened injury does not become available until the prescribed administrative remedy has been exhausted. *Myers v. Bethlehem Shipbuilding Corporation*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). The rule recognizes that agencies are created to apply their statutory authority in the first instance and that considerations of agency expertise and efficiency counsel the courts not to interfere before the agency has acted.

*Id.* at 1323. The exhaustion requirement applies to an agency's determination of its own jurisdiction. *Id.* at 1324. In the present case, defendants argue that plaintiffs have not exhausted their administrative remedies since plaintiffs may apply for and most likely receive an after-the-fact Section 10 permit from the Corps. Defendants maintain that plaintiffs have not fully exhausted their administrative remedies until they have applied for the "after-the-fact" permit and been denied its issuance. At first glance, defendants' argument appears persuasive. However, upon closer scrutiny, it is clear that defendants' position begs the question presented by plaintiffs. Plaintiffs are not before this court requesting an "after-the-fact" Section 10 permit. Rather, plaintiffs are denying the Corps' jurisdictional power to require the permit in the first instance. The issue is whether the Corps has jurisdiction to require plaintiffs to apply for and obtain the permit. Defendants have not cited any case law, nor have they identified any federal regulations that establish an administrative procedure available to plaintiffs during which the Corps' jurisdiction to require Section 10 permits may be raised and litigated. The Corps made its jurisdictional determination in this matter when it sent Swanson the "stop work" letter. Absent an identifiable administrative procedure available for challenging this asserted jurisdiction, this court must hold that plaintiffs have no administrative remedies left to exhaust. Under these circumstances, plaintiffs must be allowed to proceed before the court.

### RIPENESS

Having determined that plaintiffs are properly before this court, the court must next determine which of the plaintiffs' claims for relief are ripe for judicial

review. The present case seeks declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Cases brought under the Declaratory Judgment Act must present an actual case in controversy within the meaning of the Constitution. The Supreme Court has explained that for a case to be justiciable and ripe under the Declaratory Judgment Act, it must present facts that establish that there is a "substantial controversy, between parties having adverse legal interests, of sufficient *immediacy* and *reality* to warrant the issuance of a declaratory judgment." *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (emphasis added). The Court recognized that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Id.* at 273, 61 S.Ct. at 512.

■ When determining whether a dispute rises to the level of a justiciable controversy, the court must determine whether the issues presented are currently ripe for judicial intervention. Just as a case may be brought too late and thereby be moot, it may also be brought too early and not yet be ripe for adjudication. There are various policy considerations supporting the ripeness doctrine. Until a controversy has become concrete and focused, it is difficult for a court to evaluate the practical merits of the position taken by each of the parties. In addition, there may be a possibility that if the court waits for an actual controversy to ripen, the whole problem may be eliminated by later developments.

In the present case, the court discerns two distinguishable disputes raised by the pleadings. The first dispute concerns whether the Corps has statutorily authorized regulatory power over the recently created outer perimeter of Lake Pend Oreille. Specifically, the court must examine whether the whole of Lake Pend Oreille is subject to the Corps' Section 10 permit requirements. The second dispute concerns whether, as an integral part of the Corps' regulatory powers, it has obtained the right of public access to the perimeter areas in dispute. In this respect, a related, but unarticulated, issue arises concerning whether, if the Corps has secured the right of public access, the United States has paid for these rights under the provisions of the 1956 Judgment entered by the court in response to the Declaration of Taking filed by the United States.

■ In reference to the first dispute, the court has little difficulty finding that the issues raised are ripe for judicial determination. Swanson has constructed improvements on a portion of the lake in dispute and defendants have asserted their regulatory authority in the form of the "stop work" letter sent to Swanson. These facts give rise to an actual and present controversy concerning the authority of the Corps to regulate the outer perimeter of Lake Pend Oreille. Since defendants have actually asserted their jurisdiction and Plaintiff Swanson has opposed it, the matter is ripe for judicial determination.

■ Turning to the second dispute before the court, the posture of plaintiffs' Complaint is distinguishable. As noted, the issue is whether the defendants may require public access to the waters in dispute and, if they may, whether fair compensation was previously paid for this privilege. After reviewing the stipulated facts and other pleadings in this matter, the court is unaware of any action taken by the plaintiffs to exclude public access or by the defendants to force public access. There are no facts in the record which indicate that defendants have claimed the right to public access. Indeed, at this point, it would be mere speculation to assume that defendants anticipate such a claim. In the event that defendants take some affirmative action in the future to assert this right, then a justiciable controversy would arise. In addition, should that eventuality occur and should a court determine that defendants have obtained the right to public ac-

cess, then, and only then, would the issue of whether fair compensation was paid for that right under the Declaration of Taking and Judgment arise.

Based on the foregoing, the court finds that the only issue ripe for determination is the nature and extent of the Corps' regulatory power over the waters of Lake Pend Oreille under Section 10 of the Rivers and Harbors Act and under Section 404 of the Clean Water Act.

### CORPS' REGULATORY POWER

It is plaintiffs' position that, by way of the Declaration of Taking and Judgment, the defendants condemned only a "flowage easement" over the lands in question. Plaintiffs assert that the defendants' rights in these lands are limited by the terms of the flowage easement and that Idaho's common law relating to real property applies to determine the rights of the parties. Specifically, Plaintiff Swanson maintains that she holds title to the disputed lands in fee subject only to the flowage easement condemned by defendants. Plaintiff maintains that so long as her improvements do not interfere with defendants' ability to exercise their rights under the flowage easement, defendants have no right to regulate plaintiff's use of these lands. Defendants, on the other hand, maintain that their power to regulate plaintiff's use of the lands is independent of the tenets of common law property. Defendants maintain that their power to regulate stems from the ability of Congress to regulate interstate commerce pursuant to the United States constitution.

▬▬ There is little dispute that Congress has wide constitutional power to regulate interstate commerce and activities touching thereon. It has long been settled that Congress has extensive authority over this nation's navigable waters under the commerce clause. Early in this country's history, the Supreme Court held that the power to regulate commerce necessarily included power over navigation. *See Gibbons v. Ogden,* 9 Wheat (22 U.S.) 1, 189, 6 L.Ed. 23 (1824). As stated in *Gilman v. Philadelphia,* 3 Wall (70 U.S.) 713, 18 L.Ed. 96 (1866):

> Commerce includes navigation. The power to regulate commerce comprehends the control, for that purpose and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.

*Id.* 3 Wall. (70 U.S.) at 723–725, 18 L.Ed. at 99. In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), Justice Blackmun dissenting on other grounds noted that:

> [T]he navigational servitude symbolizes the dominant federal interest in navigation implanted in the Commerce Clause.... To preserve this interest, the National Government has been given the power not only to regulate interstate commerce by water, but also to control the waters themselves, and to maintain them as "common highways ... forever free."

*Id.* at 186, 100 S.Ct. at 396 (citations omitted). In *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), the Supreme Court recognized that:

> The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That Clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called "a dominant servitude" ... or "a superior navigation easement."

*Id.* at 224, 76 S.Ct. at 260. Based on the foregoing authority, it is clear that Congress has broad constitutional power to regulate and control activities affecting navigable waters. This power stems from the constitution and eclipses state established common law property rights. According to the stipulation filed in this case, the parties agree that for purposes of this

proceeding, Lake Pend Oreille was a navigable water of the United States prior to the construction of the Albeni Falls Dam. Post-construction, the parties agree that the waters of the lake, including those above the old high water mark, are capable of commercial interstate transportation. Thus, Lake Pend Oreille continues to be a navigable water under the general regulation adopted by the Corps. The regulation provides:

> Navigable waters of the United States are those waters that ... are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody and is not extinguished by later actions or events which impede or destroy navigable capacity.

33 C.F.R. § 329.4 (1983). Since Lake Pend Oreille was a navigable water of the United States prior to the Albeni Falls project, and since it is currently capable of being used to transport interstate commerce, under the Corps' definition it remains a navigable water. The only issue which arises is whether the newly created outer perimeter waters of the lake are included as navigable waters of the lake subject to regulation. In *Philadelphia Co. v. Stimson*, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912), the Supreme Court held, in determining the extent of Congress's power to regulate navigable waters, that:

> Nor is the authority of Congress limited to so much of the water of the river as flows over the bed of forty years ago. The alterations produced in the course of years by the action of the water do not restrict the exercise of Federal control in the regulation of commerce. Its bed may vary and its banks may change, but the Federal power remains paramount over the stream, and this control may not be defeated by the action of the state in restricting the public right of navigation within the river's ancient lines. The public right of navigation follows the stream ... and the authority of Congress goes with it.

*Id.* S.Ct. at 350 (citations omitted). Under the *Stimson* rationale, Congress's power to regulate commerce extends as the bounds of navigable waters are altered.

■ Section 10 of the Rivers and Harbors Act of 1899 establishes a permit requirement for activities which take place in "navigable waters" of the United States or which affect the navigable capacity of such waters. That section provides:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

The language of this statute unambiguously establishes that the work done by Swanson was in violation of the Act "unless the work [was] recommended by the Chief of Engineers and authorized by the Secretary of the Army prior" to its beginning. In other words, Swanson's activities were prohibited absent a Section 10 permit.

The Clean Water Act was enacted in 1972 and is a comprehensive effort by Congress to restore, and to maintain, the chemical, physical, and biological integrity of the nation's waters. The cornerstone of the regulatory scheme established by the Act

is Section 301, 33 U.S.C. § 1311, which prohibits the discharge of pollutants into "navigable waters" of the United States, except when in compliance with various other sections of the Act, including Section 404, 33 U.S.C. § 1344. Section 404 establishes a program for the issuance of permits regulating the discharge of dredge and fill materials. Pursuant to Section 404(a), the Corps has responsibility for administering the permit program.

Under both of these statutory schemes, the Corps' regulatory power extends to "navigable waters" of the United States. The court has previously ruled in this case that all of the waters of Lake Pend Oreille are "navigable waters" of the United States. It follows then that the Corps was exercising proper jurisdiction and authority when it sought to require Section 10 and Section 404 permits from Swanson.

Having found that the whole of Lake Pend Oreille, up to its new high water mark, is subject to Congress's commerce clause power to regulate, the court wishes to note by way of dicta that its holding does not attempt to establish whether defendants have obtained the right of public access to the waters in question or whether just compensation has been paid for that right. In *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court noted that the concept of "navigable waters of the United States" does not have a fixed meaning that remains unchanged in whatever context it is being applied. The court stated that all of its cases dealing with the authority of Congress to regulate navigation and the so-called "navigational servitude" could not simply be lumped into one basket. *Id.* at U.S. 170, 100 S.Ct. at 387. A careful reading of the *Kaiser* opinion reveals that though a body of water is a navigable water of the United States subject to Congress's regulatory authority under the commerce clause, it does not necessarily follow that the body of water in question is also subject to the public right of access. *Id.* U.S. at 172–73, 100 S.Ct. at 388–89. In so holding, the Supreme Court reversed the court of appeals' determination that federal regulatory authority over navigable waters and the right of public access could not consistently be separated. *See United States v. Kaiser Aetna*, 584 F.2d 378 (9th Cir.1978).

Indeed, in the present case, though the whole of Lake Pend Oreille is subject to the Corps' regulatory powers, such a holding does not necessarily mean that defendants may acquire or exercise a right to public access. As indicated in the "ripeness" portion of this opinion, the court does not believe the issue of public access is yet ripe for determination.

An order consistent with this opinion shall be entered.