[Nos. 20372-3-II; 21866-6-II.   Division Two.   July 10, 1998.]

LANCE BURTON, *Appellant*, v. CLARK COUNTY, *Respondent*.

LANCE BURTON, *Respondent*, v. CLARK COUNTY, *Appellant*.

506

*Mark A. Erikson,* for Lance Burton.

*Arthur D. Curtis, Prosecuting Attorney,* and *Christopher Horne, Deputy,* for Clark County.

MORGAN, J. — Clark County (the County) conditioned its approval of a three-lot short plat on the landowner's dedicating a right-of-way and building a road, curbs and sidewalks. The landowner objected. The resulting issue is whether the condition is a taking of private property without just compensation, or a proper exercise of the county's police power.

Lance Burton owns a small parcel of land in unincorporated Clark County. It is 0.78 acre in area and trapezoidal in shape. It is zoned for residential lots of not less than 6,000 square feet each. Its boundaries are 305 feet long on the west; 100 feet on the north; 233 feet on the east; and 125 feet on the south. It adjoins a subdivision on the west; another subdivision on the north; a parcel of raw land on the east; and high-voltage electrical transmission lines on the south. The undeveloped parcel to the east is owned by one Maddux, but the record shows little else about it.

Two nearby streets are Northeast 65th Street and Northeast 20th Avenue. Northeast 65th Street generally runs east and west. Its eastern end deadends into Burton's western boundary, forming what the county considers to be a temporary cul-de-sac. Northeast 20th Avenue generally runs north and south. Its southern end deadends into the northern boundary of Maddux's parcel, a few feet east of Burton's northeast corner. Since the mid-1980s, county

planners have wanted to connect the two roads by extending them across Burton's property, and also across the northwest corner of Maddux's property.[1] Figure 1 illustrates the area.

**Figure 1**

---

[1]The planners were relying in part on CLARK COUNTY CODE 12.05.370. It provides:

> Street extensions. Where a public or private road has been constructed or created in such a manner as to be able to be extended or widened in accordance with adopted road plans or this chapter, then: (1) All residences, buildings or structures shall be constructed in such a position on the property that they will not interfere with the extension or widening of the roadway to adjacent areas and shall be so situated that such extension will make orderly and planned development for additional road installations to meet the reasonable minimum requirements of good and safe traffic circulation, consistent with applicable zoning setbacks, and; (2) Right-of-way or private easements necessary to such extension or widening and falling within parcels being developed, shall be granted or created as a condition of development approval.

CLARK COUNTY CODE 12.05.370 is subject to, and thus has no impact on, the constitutional analysis that follows.

On May 5, 1994, Burton applied to short plat his parcel into three wedge-shaped residential lots. He proposed that each lot open onto the cul-de-sac at the east end of Northeast 65th Street. He did not want to dedicate right-of-way or build a road. Figure 2 illustrates his plan.

**Figure 2**

Before Burton submitted his application, he and the County informally discussed whether he would be required to connect Northeast 65th and Northeast 20th, and the effect such a connection would have on the lots he desired to create. The County suggested a reconfiguration, shown in Figure 3, that would give him three lots with the minimum 6,000 square feet each, yet still connect Northeast 65th with Northeast 20th:

**Figure 3**

Burton rejected this reconfiguration, in part because he thought the two southern lots would be smaller than other lots in the neighborhood, and thus hard to sell.

On June 28, 1994, the county planning director recommended approval of Burton's application—but only if Burton would extend Northeast 65th Street across his property by dedicating a right-of-way and installing a road, curbs and sidewalks.[2] The planning director stated:

> 2.     Before approval of the final plat, and except to the extent modified by the Director of Public Works or other duly authorized public official pursuant to law, the applicant shall make the following road dedications and improvements:

---

[2]Although we express this proposition in positive terms in the text, we could just as well express it in negative terms as follows: The county planning director recommended denial of Burton's application unless he would extend Northeast 65th Street across his property by dedicating a right-of-way and installing a road, curbs and sidewalks.

a.   A 50 foot wide right-of-way shall be dedicated to the County through the site for the extension of N.E. 65th Street. This right-of-way shall be surveyed and designed to eventually connect with N.E. 20th Avenue.

b.   N.E. 65th Street shall be built through the site with a 32 foot wide paved surface with curbs and sidewalks.

c.   Plans and profiles shall be prepared by an engineer, licensed in the State of Washington, and submitted to the County for approval prior to road construction.[3]

Hereafter, we refer to these requirements as "the exacted road."

Burton appealed to the county hearing examiner who, on September 22, 1994, found an "essential nexus" between the exacted road and the county's need for "street connectivity." The examiner said:

The connectivity of streets is a legitimate County interest. Connectivity increases public safety by providing alternative means for access and egress. Connectivity also reduces trip distances and thereby helps reduce pollution, makes it easier for pedestrians and bicyclists to go from one point to another more directly, and provides for less isolation between neighborhoods. Therefore, there is an essential nexus between this street exaction and the need for street connectivity within the County, and in particular, within this area.[4]

The hearing examiner also found that the exacted road was roughly proportional to Burton's development, because it was "the minimum necessary to allow the local street to go through."[5] The examiner said:

. . . [T]he nature of this street dedication and improvement requirement is roughly proportional to the proposed three lot residential development because each of the three lots will directly benefit from the road. Residents will have better emergency access and police and fire safety will therefore be enhanced. Furthermore, this connection will reduce trip dis-

---

[3]Clerk's Papers (No. 21866-6-II) at 77.

[4]*Id.* at 65.

[5]*Id.* at 67.

tances because residents will now be able to travel north along 20th Avenue to reach 68th Street, instead of having to go west along N.E. 65th Street in order to access N.E. 68th Street.

The exaction is roughly proportional in scope to the proposed three lot partition because the road extension is the minimum necessary to allow the local street to go through. The County is merely requesting the extension of one local street directly through [the] property. This will serve the site and provide a connection for future development to the east. The County is not asking for multiple road connections, nor are they asking for the connection to occur in an indirect manner.[6]

Concluding that the county had made an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development,"[7] the examiner upheld the exaction of the road.

Burton appealed to the Board of County Commissioners, which affirmed. Burton then appealed again to the superior court, which ruled that the county had "failed to make an individualized determination that [the exacted road] related both in nature and extent to the impacts from the proposed development, as required to demonstrate 'rough proportionality' under the holding in *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994)."[8] The court concluded that the exacted road was an unconstitutional taking of private property; that the road-related conditions should be "reversed and deleted" from the plat; and that the case should be "remanded for proceedings and determination consistent with this [o]rder."[9]

The parties then returned to the hearing examiner. He

---

[6]*Id.* at 66.

[7]Clerk's Papers (No. 20372-3-II) at 85.

[8]*Id.* at 741.

[9]*Id.* at 741-42. At this juncture, Burton and the county each filed a notice of appeal from the superior court's ruling. Simultaneously, each also sought further proceedings before the hearing examiner. The result, as the county puts it, was that the action "developed branches," County's opening brief at 6, one in this

held more hearings, during which the county presented a new staff report, dated April 16, 1996, asserting that Burton's proposed development would generate an additional thirty auto trips per day on nearby roads. On July 31, 1996, the examiner held that "a court of law . . . has found that the proposed dedication and improvement required by the County road standards is not roughly proportional to the impact caused by the development," and that

> [p]lanning staff's additional analysis submitted during the remand merely demonstrates that the proposed street extension would not be dissimilar or disproportionate to the cost of improvements required to serve similarly sized lots in other subdivisions in the neighborhood. This is *not* the relevant comparison for purposes of the rough proportionality test in *Dolan*. The comparison under *Dolan* must be between the impacts caused by the proposed development and the nature and extent of exaction that is being imposed. For this reason, the Hearings Examiner reject[s] staff's supplemental findings because they fail to justify [the exacted road].[10]

Based on these holdings, the hearing examiner entered an order approving Burton's short plat without the exacted road.

The County appealed to the Board of County Commissioners, which reversed the examiner's order and re-exacted the road. Burton then appealed a second time to the superior court, which reversed the Board and reinstated the examiner's order approving the plat without the exacted road.

court and one in the tribunals below. When the "branch" in the tribunals below finished—in other words, after the examiner, the Board, and the superior court had each considered this case a second time—Burton and the county filed more notices of appeal to this court.

In proceeding as they did, the parties violated RAP 7.2 and 8.3, which are intended to keep a case from "develop[ing] branches" in the absence of an appropriate order of the appellate court. (*See also* CR 54(b) and RAP 2.2(d), which are intended to keep a case from "develop[ing] branches" in the absence of an appropriate order of the trial court.) Consequently, we elect to treat each party's first notice of appeal as abandoned or, in what amounts to the same thing, as subsumed in its second notice of appeal.

[10]Clerk's Papers (No. 21866-6-II) at 479.

## I.

██ ██ The main issue is whether the federal Takings Clause prohibits the County from exacting a road without just compensation. The Takings Clause appears in the Fifth Amendment to the United States Constitution. It provides that private property shall not be taken for public use without just compensation.[11] Its purpose is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[12] It applies to the States through the Fourteenth Amendment's Due Process Clause.[13]

██ ██ The government may "take" private land[14] for public use with or without formal condemnation proceedings.[15] The nature of its conduct may be a physical act such as invading and occupying the land;[16] a legislative act such

[11]U.S. Const. amend. V.

[12]*First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 318-19, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987) (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960); *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994) (also citing *Armstrong*, 364 U.S. 40); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 835 n.4, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987) (also citing *Armstrong*, 364 U.S. 40). *See also Eastern Enters. v. Apfel*, 524 U.S. 498, 118 S. Ct. 2131, 2146, 141 L. Ed. 2d 451 (1998).

[13]*Dolan*, 512 U.S. at 383; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980); *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241, 17 S. Ct. 581, 41 L. Ed. 2d 979 (1897); *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 13, 829 P.2d 765, *cert. denied sub nom. Robinson v. City of Seattle*, 506 U.S. 1028 (1992).

[14]We refer only to private land because we have no occasion to consider how the Takings Clause affects property other than land. *Cf. Phillips v. Washington Legal Found.*, 524 U.S. 156, 118 S. Ct. 1925, 1933, 141 L. Ed. 2d 174 (1998).

[15]*First English*, 482 U.S. at 316 ("While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings."). *See also Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 656, 935 P.2d 555 (1997); *Sintra*, 119 Wn.2d at 13.

[16]*E.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982); *Griggs v. Allegheny County*, 369 U.S. 84, 82 S. Ct. 531, 7 L. Ed. 2d 585 (1962); *United States v. Causby*, 328 U.S. 256, 261, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946); *United States v. Cress*, 243 U.S. 316, 37 S. Ct. 380, 61 L. Ed. 746 (1917). *See also Eastern Enters.*, 118 S. Ct. at 2146; *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed.

as enacting a statute, ordinance or regulation;[17] or a quasi-judicial act such as denying or conditioning a development permit.[18] The effect of its conduct may be to prevent the landowner, permanently or temporarily,[19] from exclusively possessing the land;[20] from using the land in *any* economically productive way;[21] or from using the land in some, but not all, economically productive ways.[22] At present, it appears that the party claiming a taking has the burden of showing governmental conduct that will constitute a taking, if not justified as a valid exercise of the police power.[23]

Even though the Government may "take" private land with or without formal condemnation proceedings, it can justify its conduct as a proper exercise of its police power if it shows that it is merely restricting, but not eliminating, the use of such land.[24] As the United States Supreme Court

2d 798 (1992); *Sparks v. Douglas County*, 127 Wn.2d 901, 907, 904 P.2d 738 (1995); *Guimont v. Clarke*, 121 Wn.2d 586, 597, 854 P.2d 1 (1993), *cert. denied sub nom. Department of Community Dev. v. Guimont*, 510 U.S. 1176 (1994); *Guimont v. City of Seattle*, 77 Wn. App. 74, 80, 896 P.2d 70, *review denied*, 127 Wn.2d 1023 (1995).

[17]*E.g., Eastern Enters.*, 118 S. Ct. 2131; *Dolan*, 512 U.S. 374; *Lucas*, 505 U.S. 1003; *Loretto*, 458 U.S. 419; *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A.L.R. 1321 (1922).

[18]*E.g., Dolan*, 512 U.S. 374; *Nollan*, 483 U.S. 825; *Sparks*, 127 Wn.2d 901.

[19]*E.g., First English*, 482 U.S. at 318-19; *Sintra*, 131 Wn.2d at 656-57.

[20]*Lucas*, 505 U.S. at 1015; *Guimont v. Clarke*, 121 Wn.2d at 597. *See, e.g. Loretto*, 458 U.S. 419; *Kaiser Aetna*, 444 U.S. 164; *Griggs*, 369 U.S. 84; *Causby*, 328 U.S. at 261; *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 43 S. Ct. 135, 67 L. Ed. 287 (1922); *Cress*, 243 U.S. 316.

[21]*Lucas*, 505 U.S. at 1015-18; *Guimont v. Clarke*, 121 Wn.2d at 598; *Guimont v. Seattle*, 77 Wn. App. at 80.

[22]*Dolan*, 512 U.S. at 384-85; *Nollan*, 483 U.S. at 834-35.

[23]*See Eastern Enters.*, 118 S. Ct. at 2146; *Christianson v. Snohomish Health Dist.*, 133 Wn.2d 647, 660, 946 P.2d 768 (1997); *Guimont v. Seattle*, 77 Wn. App. at 81.

[24]*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) (State, in exercise of its police power, may adopt reasonable restrictions on private property so long as restrictions do not amount to taking without just compensation); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962); *Mugler v. Kansas*, 123 U.S. 623, 664-65, 8 S. Ct. 273, 31 L. Ed. 205 (1887); *Sparks*, 127 Wn.2d at 907; *Unlimited v. Kitsap*

has stated, " '[A]ll property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause [does] not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.' "[25] As the Nebraska Supreme Court has similarly stated, " 'In the exercise of the police power, public authority is empowered to require everyone so to use and enjoy his own property as not to interfere with the general welfare of the community in which he lives.' "[26] Assuming that a claimant has shown governmental conduct that will be a taking if not justified, the government bears the burden of justifying its conduct as a proper exercise of the police power, at least when its conduct is quasi-judicial in nature.[27]

In two recent cases, the United States Supreme Court has considered whether governmental conduct was a proper exercise of the police power. In the first case, *Nollan v. Cal-*

---

*County*, 50 Wn. App. 723, 727, 750 P.2d 651 ("property interest can be exacted without compensation only upon a proper exercise of government police power"), *review denied*, 111 Wn.2d 1008 (1988).

[25](Citation omitted.) *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987) (quoting *Mugler*, 123 U.S. at 664-65). *See also Christianson*, 133 Wn.2d at 666 (Talmadge, J., concurring) ("the most fundamental, and perhaps least controversial, aspect of the police power" is "the absolute right of society to protect and preserve public health"); *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 329 n.13, 787 P.2d 907 (1990). If the statement in the text were not true, the government would have to pay compensation even to enjoin a landowner from maintaining a public nuisance. *See United Steelworkers v. United States*, 361 U.S. 39, 60, 80 S. Ct. 177, 4 L. Ed. 2d 169 (1959) ("Beginning at least as early as the sixteenth century the English courts have issued injunctions to abate public nuisances." (Frankfurter, J., concurring)); *Pine City v. Munch*, 42 Minn. 342, 44 N.W. 197, 198 (1890) (a municipal corporation may resort to a court of equity to aid in enforcing its public duties to preserve the health of its inhabitants).

[26]*Simpson v. City of North Platte*, 206 Neb. 240, 292 N.W.2d 297, 300 (1980) (quoting EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 32.04 (3d ed. 1977)). *Simpson* is quoted and relied on in *Dolan*. *See also Sparks*, 127 Wn.2d at 914.

[27]*Dolan*, 512 U.S. at 391 n.8; *Christianson*, 133 Wn.2d at 660; *cf.* RCW 82.02.020 (no county shall exact a cash development fee "which *the county . . .* cannot establish is reasonably necessary as a direct result of the proposed development or plat" (emphasis added)).

*ifornia Coastal Commission*,[28] the Nollans acquired a California oceanfront lot located between Faria County Park, a public beach to the north, and the Cove, a public beach to the south. The lot was divided into two parts by an eight-foot-high seawall; its upland part was bounded by a road on the east and the seawall on the west, while its beach part was bounded by the seawall on the east and the Pacific Ocean on the west. The lot's upland part was the site of a dilapidated bungalow, which the Nollans wanted to replace with a modern three bedroom house. When they sought the necessary permit, however, the California Coastal Commission required that they dedicate an easement for public use across the beach part of their lot. The purpose of the easement, according to the initial report of the Commission's staff, was to "make it easier for the public to get to Faria County Park and the Cove."[29]

The Nollans appealed to the superior court, arguing that they could not be forced to dedicate a public easement along the beach, "absent evidence that their proposed development would have a direct adverse impact on public access to the beach."[30] Agreeing, the superior court remanded for a hearing on that issue. On remand, the Commission found that "the new house would increase blockage of the view of the ocean" from the street; that the new house would "prevent the public 'psychologically . . . from realizing a stretch of coastline exists nearby that they have every right to visit;'" and that the new house would "burden the public's ability to traverse to and along the shorefront." Based on these findings, the Commission concluded that it could and should exact from the Nollans, without compensation, "additional lateral access to the public beaches in the form of an easement across their property."[31]

The Nollans appealed through the state court system

---

[28]483 U.S. 825, 836, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987).

[29]*Id*. at 828.

[30]*Id*.

[31]*Id*. at 828-29.

and ultimately to the United States Supreme Court. That Court found no "essential nexus" between the exacted easement and any public problem created or exacerbated by the new house. Thus, it concluded that the Commission could not exact the easement without compensation.

In the other case, *Dolan v. City of Tigard*,[32] Dolan operated a 9,700 square-foot store with a gravel parking lot. The store was located on 1.67 acres in the central business district of Tigard, Oregon. A creek traversed the site's southwest corner and western boundary. Dolan applied for a permit to double the size of her store, pave a 39-space parking lot, and build another commercial building for rental to complementary businesses. The city refused the necessary permits unless Dolan would dedicate (a) the creek's floodplain for use as a drainage and flood control area; (b) the creek's floodplain for use as a public recreational area; and (c) "an additional 15-foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway."[33] Dolan appealed, claiming "that the city . . . has not identified any 'special quantifiable burdens' created by her new store that would justify the particular dedications required from her which are not required from the public at large."[34]

After various proceedings in the state court system, the case reached the United States Supreme Court. That Court posed the question, "[W]hat is the required degree of connection between the exactions imposed by the city *and the projected impacts of the proposed development.*"[35] It then answered by saying:

> We think the "reasonable relationship" test adopted by a majority of the state courts is closer to the federal constitutional norm than either of those previously discussed. But we do not adopt it as such, partly because the term "reasonable relationship" seems confusingly similar to the term "rational

---

[32]512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994).

[33]*Id.* at 380.

[34]*Id.* at 385-86.

[35]*Id.* at 375 (emphasis added).

basis" which describes the minimal level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment. We think a term such as "rough proportionality" best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination *that the required dedication is related both in nature and extent to the impact of the proposed development.*[36]

Applying this answer, the Court upheld as a valid exercise of the police power the floodplain easement for purposes of drainage and flood control. It struck, as not "roughly proportional," the floodplain easement for purposes of public recreation and the additional 15-foot easement for a pedestrian/bike path.

■ In our view, *Nollan, Dolan,* and their Washington progeny stand for at least four propositions. First, when the government conditions a land-use permit, it must identify a public problem or problems that the condition is designed to address. If the government can identify only a private problem, or no problem at all, the government lacks a "legitimate state interest" or "legitimate public purpose[]" in regulating the project.[37] Thus, the *Nollan* Court characterized a "condition for abridgement of property rights through the police power" as "a 'substantial advanc-[ing]' of a legitimate state interest."[38] The *Dolan* Court said that to evaluate Dolan's takings claim, it had to "determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition

---

[36]*Id.* at 391 (emphasis added).

[37]*Nollan* and *Dolan* use the term "legitimate state interest." *Dolan,* 512 U.S at 386; *Nollan,* 483 U.S. at 841. A number of Washington cases use the term "legitimate public purpose." *Christianson,* 133 Wn.2d at 661; *Presbytery,* 114 Wn.2d at 330; *Unlimited,* 50 Wn. App. at 727. The two terms are synonymous for present purposes.

[38]*Nollan,* 483 U.S. at 841; *see also id.* at 834 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980) ("land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land' ")).

exacted by the city.''[39] And this court previously said, about an easement exacted solely to allow the commercial development of private land:

> [T]he exaction serves no public interest, let alone a reasonable one. The public has no interest in the commercial development of the Berg/Carlson property, and it is manifestly unreasonable for Kitsap County to exact a commercial access easement to this commercially land-locked parcel . . . .[40]

Second, the government must show that the development for which a permit is sought will create or exacerbate the identified public problem.[41] This is the same as to say that there must be a relationship (nexus) between the development and the identified public problem; that the necessary relationship will exist if the development will create or exacerbate the identified problem; but that the necessary relationship will not exist if the development will not adversely impact the identified public problem. Thus, the *Nollan* Court rejected an easement that would have improved public access to the beach, even though the Commission's staff report said improved public access was needed, because the Nollans' project, replacing a bungalow with a new house, would not make the identified public problem, lack of public access, any worse than before.[42] Similarly, the *Dolan* court rejected Tigard's exaction of a floodplain easement that would have enhanced the public's recreational opportunities, even though such opportunities were needed, because Dolan's project, a larger retail outlet,

---

[39]*Dolan*, 512 U.S. at 386.

[40]*Unlimited*, 50 Wn. App. at 727.

[41]*Luxembourg Group, Inc. v. Snohomish County*, 76 Wn. App. 502, 505, 887 P.2d 446, *review denied*, 127 Wn.2d 1005 (1995); *Unlimited*, 50 Wn. App. at 727.

[42]We also note the *Nollan* Court's comment, "Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking." *Nollan*, 483 U.S. at 831. Essentially, this is a negative formulation of the proposition in the text. It says that the government may not use the permitting process as a vehicle for solving public problems not created or exacerbated by *any* project.

would not make the identified public problem, the public's lack of recreational opportunities, any worse than before.[43] These holdings are consistent with the fundamental purpose of the Takings Clause, which is *not* to bar government from requiring a developer to deal with problems of the developer's own making, but which *is* "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[44]

Third, the government must show that its proposed condition or exaction (which in plain terms is just the government's proposed solution to the identified public problem) tends to solve, or at least to alleviate, the identified public problem. In other words, the government must show a relationship (nexus) between the proposed solution and the identified problem, and such relationship cannot exist unless the proposed solution has a tendency to solve or alleviate the identified problem. Thus, the *Nollan* Court rejected the exaction of an easement along the beach, even though the Nollans' new house would exacerbate the inability of passersby to see the ocean from the road, because allowing people to walk on the beach had no tendency to restore the view from the road. Interestingly, however, the *Nollan* Court would have allowed the exaction of "a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere,"[45] because an exaction of that type would have tended to restore the view from the road. The *Dolan* Court likewise rejected the

---

[43]We also note the *Dolan* Court's comment, "Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred." *Dolan*, 512 U.S. at 384. As in the previous footnote, this is a negative formulation of the proposition in the text. It says that the government may not use the permitting process as a vehicle for solving public problems not created or exacerbated by *any* project.

[44]*Id.; Nollan*, 483 U.S. at 835 n.4. *See also Trimen Dev. Co. v. King County*, 124 Wn.2d 261, 273, 877 P.2d 187 (1994) (quoting RCW 82.02.020) (no county shall exact cash development fees "which the county . . . cannot establish is reasonably necessary as a direct result of the proposed development or plat")).

[45]*Nollan*, 483 U.S. at 836.

exaction of an easement for a pedestrian/bike path, because the fact-finding administrative tribunal had failed to find that such an easement *would* have (as opposed to *could* have) a tendency to solve or alleviate traffic congestion. Both cases represent the idea that government acts arbitrarily and irrationally, and thus outside the scope of its police power, when it mandates a solution (i.e., a condition or exaction) that has no tendency to solve the identified problem.[46]

Fourth, the government must show that its proposed solution to the identified public problem is "roughly proportional" to that part of the problem that is created or exacerbated by the landowner's development. Thus, as already seen, the *Dolan* Court posed the question, "[W]hat is the required degree of connection between [1] the exactions imposed by the city and [2] the projected impacts of the proposed development."[47] It answered by saying that the required connection was a "reasonable relationship" best described by the term "rough proportionality," and that the government "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."[48] The Washington Supreme Court ruled similarly in *Sparks v. Douglas County*,[49] where it noted that a regulatory exaction must be "reasonably calculated to prevent, or compensate for, *adverse public impacts of the proposed development*."[50] The purpose, once again, is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be

---

[46]*Nollan* summarized this by stating that if the government can constitutionally prohibit, it can constitutionally condition, but "constitutional propriety disappears . . . if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition." *Id.* at 837.

[47]*Dolan*, 512 U.S. at 375.

[48]*Id.* at 391.

[49]127 Wn.2d 901, 907, 904 P.2d 738 (1995).

[50]*Id.* (emphasis added). Later in its opinion, the *Sparks* court again noted that "local government must demonstrate that the exaction it imposes is 'roughly

borne by the public as a whole,"[51] while at the same time leaving government free to require a developer to rectify public problems insofar as the developer has created such problems.

When combined, these four propositions boil down to two relationships: a relationship between the project and the identified public problem, and a relationship between the identified public problem and the proposed solution to that problem. The required relationship between project and problem is shown by establishing the first and second propositions set forth above, while the required relationship between problem and solution is shown by establishing the third and fourth propositions set forth above. The ultimate goal is to show that the proposed condition or exaction (i.e., the proposed solution to an identified public problem) is reasonably related to all or part of an identified public problem that arises from (i.e., is created or exacerbated by) the development project. Unless the government makes this showing, it lacks a "legitimate state interest" or a "legitimate public purpose" in imposing the condition or exaction.

We assume that the government may sometimes rely on the future as well as the present when attempting to establish these relationships.[52] At a minimum, however, it may not rely on the future unless the record furnishes a basis

---

proportional' *to the impact of the development." Id.* at 912 (emphasis added).

[51]*Dolan*, 512 U.S. at 384; *Nollan*, 483 U.S. at 835 n.4.

[52]The extent to which the government may rely on future events is not well settled. As the Washington Supreme Court noted in *Sparks*, a case involving the exaction of easements for the widening of certain roads:

> But the fact that the dedications in this case were imposed, in part, to accommodate anticipated *future* improvement of the roads makes application of the *Dolan* standard less certain. It is not clear whether, under *Dolan*, municipalities may take into account future developments and their anticipated cumulative impacts.

*Sparks*, 127 Wn.2d at 914.

for inferring what the foreseeable future holds.[53] Thus, in *Unlimited v. Kitsap County*,[54] where the county wanted to exact an easement in favor of a parcel known as the Berg/Carlson property, we rejected the exaction because the county "intends to hold the exacted property until some undefined future time when Randall Way can be extended to connect with other, as yet unbuilt, roads,"[55] and because "[t]here is no expectation that the Berg/Carlson property is to be developed at the same time as Unlimited's development, or, for that matter, any time soon."[56] And in *Simpson v. North Platte*,[57] a case cited in *Dolan*, the Nebraska Supreme Court rejected a similar exaction. The *Simpson* landowners wanted to construct a fast-food restaurant, but the city would not issue the necessary permits unless they dedicated a right of way through their land. "[N]one of the real estate for [the road] ha[d] been acquired by the City nor [was] there any indication as to when, if ever, such real estate [would] be acquired by the City."[58] Rejecting the easement, the court stated:

> [N]o project was immediately contemplated whereby the street would be constructed nor is there any evidence regarding what the particular project would involve. Furthermore, there is no evidence to indicate that the construction of the project . . . would create such additional traffic as to require going forward with the proposed street project. As the evidence indicates, no other adjacent property owner would be required to dedicate any land for a public street unless a building permit is sought, nor would any other land now be acquired for a public street in the area. It is difficult, if not impossible, to see how this is

[53]Because the record can never give a basis for inferring what the *non*-foreseeable future holds, the word "foreseeable" may be redundant.

[54]50 Wn. App. 723, 750 P.2d 651 (1988).

[55]*Id.* at 728.

[56]*Id.* at 727.

[57]206 Neb. 240, 292 N.W.2d 297 (1980).

[58]*Simpson*, 292 N.W.2d at 300.

anything more than a 'land banking' operation which is clearly in violation of Neb. Const. art. I, section 21.[59]

Turning to the facts of this case, we address two questions: (1) Does the record show a reasonable relationship between project and problem? (2) Does the record show a reasonable relationship between problem and solution?

We can quickly dispose of the relationship between project and problem. The county identifies three problems that it claims Burton's project will exacerbate. It emphasizes traffic circulation, for it wants to minimize "pocket neighborhoods" that lack access to adjoining neighborhoods. It also identifies, as related problems, traffic congestion and emergency vehicle access. The last, emergency vehicle access, has various facets, including (a) whether police and fire personnel can quickly reach the homes Burton intends to build, and (b) whether fire trucks responding to one of the homes can quickly turn around if called to another emergency elsewhere.

Each identified problem is public, as opposed to private. Moreover, each will be exacerbated by Burton's project to at least a slight degree. Burton's project will bring more residents to the neighborhood and generate about 30 vehicle trips per day on neighborhood roads. This means an increase in the need for adequate traffic circulation in and out of the neighborhood; in the congestion on neighborhood roads (with or without better circulation); and in the likelihood that police and fire units will be called to and from the neighborhood in emergency situations. The record shows a reasonable relationship between project and problem.

The relationship between problem and solution requires more attention. The reason is that the record shows nothing about when, if ever, the road being exacted from Burton will extend across the Maddux's parcel and connect with Northeast 20th Avenue. To ascertain the results of that omission, we discuss (a) the effects of the exacted road

---

[59]*Id.* at 301.

when and if it ever connects with Northeast 20th Avenue; (b) the effects of the exacted road if it never connects with Northeast 20th Avenue; and (c) the factual question of when, if ever, the exacted road will connect with Northeast 20th Avenue.

When and if the exacted road connects with Northeast 20th Avenue, it will tend to alleviate the identified public problems. Traffic will be able to circulate to the east as well as to the west; not all traffic will have to use the roads to the west; police and fire vehicles will be able to enter the neighborhood from either direction; and fire trucks will be able to exit the neighborhood without needing to turn around. Moreover, the exacted road will tend to alleviate the identified public problems in a way that is "roughly proportional" to the project's effect on those problems. Even though Burton's project will exacerbate the identified problems to only a small degree, the exacted road is only a small part of the solution to those problems, which is the creation of an overall street grid as the area changes from rural to urban.

If the road never connects with Northeast 20th Avenue, it will lack any tendency to solve or alleviate any of the identified public problems. It will not better traffic circulation, for traffic will not be able to circulate to the east and north. It will not lessen traffic congestion, because all traffic, including that generated by the development, will still be forced to use the roads to the west. It will not improve police and fire ingress, because all emergency vehicles will still have to come from the west. It will not improve fire truck egress, for it will deadend at Burton's eastern property line with a temporary stub not much different from the one that exists today at Burton's west property line. It will, in short, be a road to nowhere.

The crucial question, then, is this: If the exacted road is built across Burton's parcel, when, if ever, will it extend across Maddux's parcel and connect with Northeast 20th Avenue? Like any other question of fact, it may be answered

directly or circumstantially.[60] It is not answered here, however, because the record is devoid of *any* evidence from which to infer when, if ever, the exacted road will cross Maddux's parcel and connect with Northeast 20th Avenue. One county staff report said only that the exacted road "shall be surveyed and designed to *eventually connect* with N.E. 20th Avenue."[61] (Emphasis added.) Another county staff report said only that Northeast 65th Street was intended "for *eventual connection* with NE 20th Avenue."[62] (Emphasis added.) The county's public works director found only that Burton should build the exacted road "so that it can *eventually connect* to NE 20th Avenue."[63] The hearing examiner did *not* find that the exacted road would *ever* connect with Northeast 20th Avenue, much less *when* it might connect, although he did find that "a future street plan has not been adopted for this area."[64] The Board of Commissioners found only that the exacted road was needed "for *potential future connection* to NE 20th Avenue."[65] (Emphasis added.) Even taken in the light most favorable to the county, none of this evidence provides a basis for reasonably inferring that the exacted road will connect with Northeast 20th Avenue in the foreseeable future; and, without such an inference, the exacted road lacks any tendency to solve or even alleviate the public problems that the county identifies. We conclude that the county has failed to bear its burden of showing that the

---

[60]We assume, for example, that the question could be answered by the county's statement that it will condemn and construct a road across Maddux's parcel if, after a certain period, Maddux has not done so; by a combination of Maddux's statement that she intends to develop soon and the county's statement that it will exact a road when she applies for a permit to develop; by evidence showing that in the experience of reputable and qualified urban planners, "infill" parcels like Maddux's are usually developed within a certain time after the urbanization process starts; or in a variety of other ways.

[61]Clerk's Papers (20372-3-II) at 96.

[62]*Id.* at 30.

[63]*Id.* at 125-26.

[64]*Id.* at 716.

[65]*Id.* at 10.

exacted road is a reasonable exercise of its police power, and that the examiner was correct when, after he heard the case on remand, he approved the plat without the exacted road.

## II.

■ Another issue is whether the county violated Burton's right to substantive due process. We need not reach this issue, because Burton's federal takings claim is dispositive.[66] In passing, we observe that the ideas inherent in the federal Takings Clause may be the same as those in the "three-prong test" that determines whether a regulation violates substantive due process.[67]

## III.

■ The last issue is whether Burton is entitled to

[66]*See Giumont v. Clarke*, 121 Wn.2d at 594; *Jones v. King County*, 74 Wn. App. 467, 477-78, 874 P.2d 853 (1994).

[67]The three-prong test involves "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the land owner." *Christianson*, 133 Wn.2d at 661; *Guimont v. Clarke*, 121 Wn.2d at 609. Rephrased to include all governmental conduct, instead of just one specific type of such conduct (the enactment of a regulation), the first prong is the same as asking whether governmental conduct (i.e., the government's proposed solution to a perceived problem) is aimed at a *public* problem, as opposed to a *private* one. *Presbytery*, 114 Wn.2d at 330. Similarly rephrased, the second prong is the same as asking whether governmental conduct tends to solve the identified public problem. *Id.* The third prong is at least arguably the same as asking whether the government's proposed solution is roughly proportional to that part of the identified public problem that the developer's project will create or exacerbate. Because the third prong's purpose "is to prevent excessive police power regulations [i.e., a specific form of governmental conduct] that require the landowner 'to shoulder an economic burden, which in justice and fairness, the public should rightfully bear,' " *Christianson*, 133 Wn.2d at 664, it would seem that governmental conduct is not "unduly oppressive" if it goes no farther than to require the developer to rectify public problems of the developer's own creation. *See generally id.* at 667 (Talmadge, J., concurring); *Orion Corp. v. State*, 109 Wn.2d 621, 646, 747 P.2d 1062 (noting, without approval, that "commentators have also pointed out that the regulatory takings doctrine and the longstanding substantive due process test seem analytically identical"), *cert. denied*, 486 U.S. 1022 (1988). Regarding the propriety of substantive due process as a overall concept, see *Eastern Enters.*, 118 S. Ct. at 2153 (section IV-D of plurality opinion); *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905).

damages and reasonable attorney's fees. He is not, because he never alleged a claim for damages or reasonable attorney's fees in any of his pleadings.[68] Moreover, he initially sought a writ of certiorari, and in that type of action the superior court may not entertain a claim for damages or fees that the tribunal below lacked jurisdiction to award.[69]

The parties' remaining arguments lack merit or need not be reached.

We affirm the examiner's order approving the plat without the exacted road.

SEINFELD and HUNT, JJ., concur.

Review denied at 137 Wn.2d 1015 (1999).

---

[68]Burton did argue for damages and fees in a trial brief. He now claims that his argument was litigated and decided by the trial court without objection from either party. In fact, however, the trial court declined to consider his argument, saying he would have to pursue it in a separate proceeding. Report of Proceedings at 36 (Oct. 27, 1995).

[69]*Punton v. City of Seattle Pub. Safety Comm'n*, 32 Wn. App. 959, 970, 650 P.2d 1138 (1982), *review denied*, 98 Wn.2d 1014 (1983), *overruled on other grounds by Danielson v. City of Seattle*, 108 Wn.2d 788, 742 P.2d 717 (1987); *see also Cohn v. Department of Corrections*, 78 Wn. App. 63, 69-70, 895 P.2d 857 (1995) (superior court lacked authority to award fees where administrative board it was reviewing lacked authority to award fees); *cf. Price v. Farmers Ins. Co.*, 133 Wn.2d 490, 946 P.2d 388 (1997).