**Dissenting Opinion of March 15, 2012, Withdrawn; Affirmed and Corrected Majority and Dissenting Opinions filed March 27, 2012.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-11-00228-CV**
**NO. 14-11-00257-CV**

---

**PATRICIO D. SANCHEZ, Appellant**

**V.**

**SOUTHAMPTON CIVIC CLUB, INC., Appellee**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-45026**

---

## CORRECTED DISSENTING OPINION

This court withdraws its opinion of March 15, 2012, and issues a corrected opinion in its place to include the number of the consolidated appeal.

The majority affirms the trial court's summary judgment in this deed-restriction case, holding that Sanchez violated those restrictions when he built a fence on his property within the utility easement because Southampton's garbage collection is a proper use of the three-foot utility easement. I respectfully disagree for two reasons as outlined below.

## BACKGROUND

The following undisputed facts arise from the summary judgment evidence:

- Since the time of the original Southampton Place plat, the City of Houston has owned an eight-foot alley that runs behind Sanchez's home.

- Since the 1923 restrictions at issue, a three-foot wide easement has existed on either side of the alley.

- The plain language of the restriction states the easement purpose:

  **Such easement to be used by the Trustee and its successors and assigns for the laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility other than railroad, street railway, and other transportation lines.**[1]

- The plain language of the restriction further provides that **"no permanent improvements or buildings shall ever be erected thereon which will interfere with the use of said easement for the purposes for which it is reserved."**[2]

- Until 2007, Southampton residents freely obstructed the three-foot easement in ways that prevented driving on the easement.

- The three-foot easement also contains, *inter alia,* utility poles that have been erected on the edge of the utility easement—that is, the eight-foot line.

- Garbage trucks servicing Southampton residents via the eight-foot alley over the years have become larger.

- Currently, the average City garbage truck is eight feet wide, wheel hub to wheel hub.

---

[1] Emphasis supplied.

[2] Emphasis supplied.

2

- Because of their size, these City garbage trucks were forced to weave in and out of the utility easements to avoid the utility poles and service meters.

- Several of the utility poles in the subject alley have notches "where the top edges of trucks collide with the poles."

- "The narrow alleys have been a cause of two near-disastrous ruptures of utility gas lines to alley meters."

- The City of Houston refused to provide further alley-garbage service to Southampton in 1990 because the alley was not wide enough.

- Therefore, Southampton began subcontracted garbage service, using smaller trucks, at a per-resident cost of $185.00; but these trucks still struggle with the alley width.

- Southampton has continued to collect garbage via the eight-foot alley despite not only the current resident obstructions, but also the Southwestern Bell/Center Point utility poles "on the actual edge of the eight-foot alley right of way rather than inside the 3-foot easement at the fourteen-foot line." It is current pole placement that has led to "chronic, extensive damage to poles."

- In 2004, Southampton even urged a need for an alley setback amendment to the City's development ordinance. In that letter, Southampton acknowledged that "our neighborhood was developed in the 1920's and its alleys were developed in light of vehicle access anticipated at that time."

- Southampton implemented a new policy in late 2007 to prevent future resident-initiated utility-easement obstructions and to phase out such existing utility-easement obstructions.

- Sanchez, a resident, ignored the policy and built a fence on the utility easement.

## ANALYSIS

### I.    I disagree that there is any evidence, let alone conclusive evidence, that Sanchez violated the unambiguous restriction because he has not actually interfered with use of the easement for the purpose reserved.

The trial court determined that Sanchez "has violated the 1923 Restrictions of Southampton Place subdivision by erecting a fence and landscaping that **intrude** into the three-foot (3') easement/right of way adjoining the eight-foot (8') alley."[3] The majority

---

[3] Emphasis supplied. The court never finds there is interference—only intrusion.

concludes that the restrictions unambiguously permit garbage collection, as a public utility, to use the easement. However, even assuming garbage collection to be a purpose of the easement, there is no evidence that *Sanchez's fence* will interfere with the use of the easement for the purposes for which it is reserved, as required by the restriction.[4]

The undisputed evidence is that Sanchez's fence is within the three-foot easement along with more than fifty years of other fences, gas meters, and utility poles that prevent a garbage truck from driving unimpeded down the alley. In fact, appellee admits that it is Southampton's "new enforcement policy" that Sanchez violated; that policy forbids all encroachments, not just those that interfere.[5]

This undisputed evidence includes an affidavit from Evalyn Krudy, former Manager/Executive Director of the Southampton Civil Club, Inc., who states that "[t]he construction of permanent fences and other obstructions in the three-foot strips that comprise part of the alleyway system interferes with the use of the alleyway system for the collection of garbage and other public utility functions. . . . Each obstruction – each interference – functions to make it increasingly more difficult for the neighborhood to use the alleyway system for its intended public utility purposes and sets the stage for future total blockage of the alleys." It is not Sanchez's fence that interferes—it is the "permanent fences and other obstructions."

The obstructions Krudy speaks of are not new. Lee Duggan, a former appellate justice and a former Southampton resident, recollects in his affidavit that even at the time

---

[4] Appellee cites *Sheppard v. City and County Dallas Levee Improvement District*, 112 S.W.2d 253 (Tex. Civ. App.—Dallas 1937, no writ), to suggest actual interference is not necessary. *Sheppard* does not support that proposition. In *Sheppard*, the defendant presented evidence that Sheppard's two iron sheds and a post and wire fence actually interfered with the levee easement because Sheppard "eradicated the Bermuda grass and dug postholes in the side of the levee," which made the levee susceptible to slides and erosion. *Id.* at 255.

[5] In its response to Sanchez's motion for summary judgment, appellee stated that "Sanchez's intentional enclosure of part of the easement/right of way behind his residence at 2001 Sunset Boulevard, Houston, Texas, squarely presents the issue: Will Southampton's alleys by preserved? This issue is before the court with perfect clarity because Sanchez proceeded intentionally, with actual knowledge that he encroached, with express notice of the Civic Club policy that no new encroachments would be permitted, and even with notice of the Civic Club's concern that non-enforcement would eventually lead to loss of the alley access."

4

he lived in Southampton from 1934 to 1960, garbage trucks "needed to steer around utility structures in the alleys such as utility poles and gas meters, as well as to avoid hitting the garbage cans placed in the easements." Thus, these obstructions predate Sanchez's fence by more than fifty years.

Southampton acknowledged the crisis of these obstructions at least as early as 2004. In a September 8, 2004 letter to Mayor Bill White, Hugh Rice Kelly, chair of the Southampton Alley Taskforce, "urgently" proposed adoption of a "new section to the development ordinance" that "would prohibit construction of any new obstructions within the flanking easements, including fences, high curbs, landscaping and anything else that could impede free use of the alley by large vehicles." The proposal included a request "that utilities be required to move their facilities to maximize clearance" including Southwestern Bell/Center Point utility poles "on the actual edge of the eight-foot alley right of way rather than inside the three-foot easement at the fourteen-foot line."[6] Thus, this urgent need in 2004, created by residents and utilities alike, predates Sanchez's fence by approximately five years.

Southampton ultimately created a solution to the alley obstruction problem. John Thompson, the 2010 President of the Southampton Civic Club, testified that, due to a growing number of easement encroachments, the board adopted a "new alley enforcement policy to prohibit any new, permanent encroachments into the 3-foot easement/right-of-ways." The Board determined, however, that "encroachments existing before December 2007 were grandfathered" such that they did not need to be removed.[7]

---

[6] The record suggests, thought it is not entirely clear, that the City rejected this proposal.

[7] Because the majority concludes, and I concur, that the restrictions are unambiguous, there is no need to reach any question about the Southampton Board of Directors' exercise of "statutory discretion" to adopt the new enforcement policy. Were we to reach this question, however, such enforcement policy would, in my opinion, be vulnerable as arbitrary, capricious, or discriminatory in violation of section 202.004(a) of the Texas Property Code inasmuch as Southampton residents are arbitrarily treated differently (grandfathering) and are singled out for enforcement of a Southampton policy that cannot accomplish its purpose without the myriad utility companies moving the very obstruction specifically mentioned in the easement grant. *But cf. Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 933–34 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that civic club's disparate treatment of lot owners' request for variance did not establish arbitrary, capricious, or discriminatory enforcement).

On this undisputed record, Sanchez's fence does not and could not interfere with garbage collection until and unless the other obstructions are removed. Stated differently, with or without the Sanchez fence, a garbage truck cannot currently drive down the Southampton alley without weaving around, and occasionally hitting, utility poles and gas meters. The interference, if any, has existed for well over fifty years. As such, the trial court erred in determining that Sanchez violated the express language of the deed restrictions as a matter of law. I would reverse on this point alone.

## II.    I disagree that the unambiguous "purposes for which [the 1923 easement] is reserved" includes a road for vehicular traffic.

What is not at issue in this case is the original 1924 dedication of an 8-foot alley running behind the property at issue. Our assignment is to determine the scope of the easement rights conveyed. The majority concludes that garbage collection is a purpose for which the easement was reserved. In my opinion, this conclusion is either immaterial to the dispute or insufficient to support the ultimate disposition. Appellee sought summary judgment that the easement includes "the collection of garbage, **and that the garbage collection function may be achieved using the adjoining three-foot strips to accommodate the reasonably necessary vehicular traffic involved in such activity** . . . ."[8] Thus, the issue is whether the purposes for which the easement is reserved includes use of the three-foot easement *as a road* for garbage trucks collecting garbage and, more specifically, whether the "roadway" right is implied by the above provision.

We know that there is no express grant for use of the easement as a road—the words "road" and "street" do not appear in the grant. Use of the phrase "right-of-way" does not mean road; rather it means nothing more than a "right of passage." *See Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 871 (Tex. App.—Austin 1988, writ denied). Thus, a right-of-way may or may not be a road. Likewise, use of the phrase "right of ingress" does not express a grant for a road as a matter of law. *See Arden v. Boone*, 221 S.W. 265, 266 (Tex. Comm'n App. 1920, judgm't approved) (holding that

---

[8] Emphasis supplied.

6

whether an easement affords a right to a roadway free from gates and bars depends upon the terms of the grant, its purpose, the nature and situation of the property, and the manner in which it is used); *see also Ferrara v. Moore*, 318 S.W.3d 487, 491–92 (Tex. App.—Texarkana 2010, pet. denied) (holding that easement language "non-exclusive right-of-way for purposes of ingress and egress between a public road and the tract conveyed" prohibited fencing that denied access); *Gerstner v. Wilhelm*, 584 S.W.2d 955, 958 Tex. Civ. App.—Austin 1979, writ dism'd) (holding that easement language "free and uninterrupted use, liberty and easement of passing" prohibited fencing); *Hillburn v. Providian Holdings, Inc.*, No. 01-06-00961-CV, 2008 WL 4836840, at *4–6 (Tex. App.—Houston [1st Dist.] Nov. 6, 2008, no pet.) (mem. op.) (holding that easement language "providing free and uninterrupted pedestrian and vehicular ingress to and egress from the Dominant Estate property" prohibited fencing that denied access). The cited authorities show that fencing is not necessarily prohibited even on **uninterrupted** ingress/egress easements. At best, we would need to imply the term "uninterrupted" to the easement grant. *See Barrow v. Pickett*, No. 01-06-00664-CV, 2007 WL 3293712, at *3 (Tex. App.—Houston [1st Dist.] Nov. 8, 2007, no pet.) (mem. op.) (holding that to construe right of ingress and egress as affording unrestricted access would require the court to read "free and uninterrupted" into the four corners of the document). A grant to the "right of ingress" may or may not be a road.

Thus, for the easement conveyed to include a right to use it as a road for garbage collection, this Court must find such a right implied in the text. We are forbidden to imply rights by the easement unless such rights are reasonably necessary to fairly enjoy the rights expressly granted in the easement. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 701 (Tex. 2002); *see id.* at 707 (holding that an easement for "an electric transmission or distribution line or system" does not allow the easement to be used for cable-television lines). In short, "if a particular purpose is not provided for in [a] grant, a use pursuing that purpose is not allowed." *Id.* at 701.

Giving care in construing easements makes good policy sense. "A property owner's right to exclude others from his or her property is recognized as one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* at 700 (internal quotations omitted) (citing *Dolan v. City of Tigard*, 512 U.S. 374, 387 (1994); *Loretto v. Telprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). There is no doubt that a landowner may choose to relinquish a portion of the right to exclude by granting an easement, but such a relinquishment is limited in nature. *Id.* And, because the easement is a nonpossessory interest, it authorizes the holder to use the property for only particular purposes. *Id.* (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 cmt. d.). Most important, an easement owner must make a reasonable use of the right so as not to unreasonably interfere with the property rights of the servient estate. *See San Jacinto Sand Co. v. Sw. Bell Tel. Co.*, 426 S.W.2d 338, 345 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.).

As outlined above, the stated purpose of the easement grant is: "laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility other than railroad, street railway, and other transportation lines." In construing the covenant, the primary task is to determine the intent of the framers. *Oldfield v. City of Houston*, 15 S.W.3d 219, 223–24 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A.,* 956 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)).

Contract-construction rules require that we consider the entire document to harmonize and give effect to all provisions of the contract so that none are meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Thus, for example, we must also consider and harmonize the further provision that "no permanent improvements or buildings shall ever be erected thereon which will interfere with the use of said easement for the purposes for which it is reserved." However,

8

appellee's construction fails this principle. If the easement is intended as a vehicular roadway, the "interfere" provision is meaningless. In fact, the "new enforcement policy" of Southampton makes this point crystal clear; the policy forbids **any encroachments** because Southampton wants the easement as a road.

Another "long-established" contract-construction rule is that "'[n]o one phase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (quoting *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 121 S.W.2d 579, 583 (1938)). Yet, that is precisely what the majority and appellee do. They isolate the phrase "other proper or necessary public utility" from the remainder of the sentence to conclude that the implicit intent is that public utilities use the easement in any way they need it. Removing this phrase from its context allows a construction that ignores that all other purposes specifically mentioned are "laying" purposes; the word "laying" modifies every other specific purpose in the enumerated series. Moreover, the exclusionary phrase that follows the "laying" purposes forbids "transportation line" purposes. As such, in context, there is no implied right to vehicular traffic over this three-foot easement. Therefore, the trial court erred in determining that Sanchez violated the deed restrictions as a matter of law. I would reverse on this independent point as well.

## CONCLUSION

If this case were about whether the Southampton alley needs to be wider, the analysis would be simple and the answer would be "yes." If Texas law authorized this Court to place the needs of the many Southampton residents[9] over the desires of one Southampton resident, the analysis would, again, be simple and Sanchez would need to yield. But, the Texas Supreme Court forbids consideration of "important public policies"

---

[9] Southampton alleges, and Sanchez does not refute, that many residents may only access their property from the alley and that "millions of dollars are presently invested in garbage-collection, garages, and other improvements accessible only from the alleys."

9

that disturb the contracting parties' intent. *See Marcus Cable Assocs., L.P.*, 90 S.W.3d at 702.

The easements are for the stated purpose of laying, among others, utility poles; vehicles cannot drive through utility poles. The easements are for the purpose of laying, among others, service meters; a vehicle cannot drive through the service meters. These utilities fulfill the express purpose of the easements and, therefore, they foreclose an interpretation that the framers intended vehicular traffic, even vehicular traffic for a municipal purpose. Therefore, under accepted principles of contract construction which govern here, the proper municipal purposes cannot include vehicular traffic.

Because the easement grant did not contemplate or intend vehicular traffic and because the easement language did not forbid all "intrusions" into the three-foot easement, this record does not support the conclusion that Sanchez violated the deed restrictions as a matter of law.

For at least ten years, the Southampton Civic Club has tried to find a solution to its inadequate-alley problem. The passage of time and the increasing girth of not just garbage trucks, but all vehicles, exacerbate the problem. However, the passage of time has changed neither the express language nor the intent of the 1923 easement. We cannot and should not engage in a strained contract interpretation to achieve an admirable result on an unassigned task.


/s/     Sharon McCally
        Justice


Panel consists of Justices Brown, Boyce, and McCally. (Brown, J., majority).


10